BRENNAN LUMBER COMPANY v. GREAT NORTHERN RAILWAY COMPANY.

August 2, 1899.

Nos. 11,609—(57).

### Fire—Verdict not Sustained by Evidence.

Evidence in this case considered, and *held*, that it did not sufficiently appear that the fire which destroyed plaintiff's property was traced or identified as having been started by the defendant.

Action in the district court for Pine county to recover $130,000 damages for injury to plaintiff's property alleged to have been caused by a fire set by defendant's engine. The case was tried before Crosby, J., and a jury, which rendered a verdict in favor of plaintiff for $67,554.46; and from an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed.

*C. Wellington,* for appellant.

*Clapp & Macartney* and *L. H. McKusick,* for respondent.

BUCK, J.

This action was brought by the Brennan Lumber Company, plaintiff, about August 15, 1896, to recover of the defendant the sum of $130,000 damages which it alleges it sustained on account of a fire running over plaintiff's land, and thereby burning and injuring pine timber and trees on said land, and destroying plaintiff's lumber camp thereon situate. It is also alleged that the fire originated September 17, 1891, on the line of defendant's railroad, by its train setting fire to dry grass, brush, and other inflammable material allowed by defendant to accumulate upon its right of way, and that the fire extended over intervening lands to the lands of the plaintiff, where it damaged said timber and trees. The different tracts of land are specifically designated in the complaint, and are within a territory about twelve miles north and south and about nine miles east and west, and all northerly and northwesterly of the Great Northern Railway. The allegations of the complaint were denied by the answer. When the testimony was closed, the defendant moved for a verdict to be directed in its favor upon certain grounds stated in the motion. This motion was denied. The jury then returned a verdict in favor of the plaintiff for the sum of $67,554.46. Upon a settled case the defendant moved for a judgment notwithstanding the verdict, and, if that was not granted, then that it be granted a new trial. Motion denied, and it appeals to this court from said order.

The evidence is quite voluminous, nearly all upon two points: (1) As to the origin of the fire that caused the damage, and (2) as to the amount of damages.

From the view which we take of the case, we do not deem it necessary to discuss and pass upon the question of damages, as the pivotal question is that upon the evidence,—did it warrant the jury in finding a verdict in favor of the plaintiff? In order to do this, it must reasonably have tended to show that the fire which caused the damage for which plaintiff sues originated through the negligence of the defendant.

The timber and trees destroyed were pine, and that is the character of the trees in the surrounding territory. A better understanding of the geography of that region or territory can be had by taking the village of Hinckley as a basis therefor. The village is situate upon section 24, township 41, range 21, in the county of Kanabec. The defendant railroad runs in a southwesterly direction from Hinckley through this county, and in said village it is intersected by the St. Paul & Duluth Railroad, running north and south. Hinckley is situate on one of the extreme easterly sections of the governmental townships, nearly equidistant between the north and south lines thereof. About one-third of the land upon which this timber and the trees in controversy stood is in this governmental township, and in the northerly and northwesterly part thereof, and the nearest line of this main body of the land is between four and five miles from where it is claimed the fire started. The balance of the lands are in the following townships, viz.: Township 41, range 22, adjoining township 41, range 21, on the west, and adjoining the latter on the north is township 42, range 21, and west of this is township 42, range 22, and on the east township 42, range 20. Only about 500 acres of this land is in this last-described township, and is situate about three or four miles northeast of Hinckley. The most southeasterly land in township 41, range 21, is a separate 40-acre tract in section 20, about one and a half miles from the main body of land, and about four miles west of Hinckley, and nearly three miles northeasterly of the point where the plaintiff claims that the fire started which caused the damage. Township 41, range 22, directly west of township 41, range 21, contains only about 200 acres of this land, which is in section 2, and is about six or seven miles northwest from the defendant's road where the fire is claimed to have originated. The tract of this land near-

est to Hinckley is about three miles northwest therefrom in section 15, township 41, range 21. This consists of only 120 acres, distant from the main body about two miles.

In order to enable the plaintiff to recover in this action, it became necessary for it to trace the fire from the point where it alleges it started to its land where the damages occurred. To this end the plaintiff called as a witness Nels Mortinson, who lived in Hinckley in September, 1891, and was working for defendant under a section foreman by the name of Gorman. He testified as follows:

"I was working about four miles west of Hinckley. I saw fire come up there that day. As the freight came along, and went east, smoke came up right after it went. This was between bridges 83 and 84. There is a cut from 83 up. The train was going east. It is close to bridge 83, and crossing close to that bridge, nearer 83 than 84. The freight came along that afternoon. We saw smoke coming out. We went down on a hand car, and tried to stop that fire. There was a fire in a little crossing, I should judge about half a mile, or something like that, east of bridge 83; and the wind was pretty hard that day, and we could not stop it; it ran away; got outside the fence. I saw it immediately after the train passed. Saw no fire along the track anywheres before. I was working on the section all day, and was about a mile and a half from the point where the fire started. The track was spread. Don't remember exactly the other men who were there. One fellow's name is Newburgh; I remember that; and the other, I think, his name is Gorman, and his son. We all went down together on the hand car. * * * After the fire got away, we could not do anything. Mr. Gorman put me on to watch the track and the bridges. [Witness refers to map.] That was the same crossing. At this time there was no fire on the south side of the track on that section. I had been at work on the section two days before this. I went on the bridge to watch there that night. I saw no fire, only the same fire that got out, except on the next section there was a fire on the south of the section. I observed this particular fire during the night, burning. It burned the north side. The wind was from the south, drove the fire north. I was on the section the next day, and observed the fire burning. It was burning north; and the next night I observed it burning in the same direction. I don't know if that fire reached Hinckley or not; I can't tell. I can't exactly say how long I observed the fire going in a northeasterly direction. I remember seeing this fire for quite a few days after. It was going north, as far as I know, after it got out. The fire spread out, so I can't just exactly tell. After it got in there, it goes on both sides,—kind of spread out. In the two days I was working there before I saw this

fire start up I see no fire on the south side on that section. The section is between six and seven miles, and runs west about half a mile or three-quarters from the point where this fire started."

On cross-examination he testified as follows: "There is a creek down to Pokegama. There is a creek goes right through 83,—a small creek; and there is one up to Pokegama west of it. The place where the fire started was close to the creek on that section. East of the creek—I am clear that it started east of the creek, on Gorman's section—there is another creek we used to call 'Mission Creek.' That is east of 83. Don't remember how far it is. Cannot exactly tell; it is a good while ago. The creek there on Gorman's section, called 'East Pokegama Creek,' that must be the creek. That must be the creek of 83 that was called 'East Pokegama.' Nelson's section ran right up to that bridge. That must be a mile and a half, I guess, a mile and a half east of Pokegama. We were raising and repairing the track.  *  *  *  The smoke was not very big. When we first came there, the fire was not very big. Gorman was on the hand car, and a man whose name was Newburgh, and myself. I watched the bridge that night; watched along there,—the track there; moved around, so I saw the fire did not get in there.  *  *  *  When I first went to work on the section, two days before this fire started, I observed a fire towards Pokegama. It appeared to be on the south side of the track. It was something we had between Pokegama and bridge 83; right in there between the two. That was east from the track. That was not into the track that I see. After the 17th, I saw smoke come from there, and it seemed to be getting up a little closer, and there was fire, either one or two days after, got right in there on the south side of bridge 83. That fire crossed the track, and went north. I don't remember when I stopped work on the section. I recollect of a fire being up around Hinckley, and I helped to fight the fire at Hinckley. There were fires coming in from the south there, and I helped to fight those fires. It was after September 17 that I went to fight the fire at Hinckley. It can't be over two or three days anyway after the 17th. The wind was blowing strong all the while mostly. Sometimes it was not going so hard. At another time it got up and drove it. In the nighttime it didn't blow very much then. From the 17th to the 25th of September there was smoke all over, south of the track and north of the track, and all around Hinckley; smoke to the east of Hinckley, and smoke to the north, too. It was a dry season, so far as I know."

The next witness called by the plaintiff, named Hawkinson, testified that one evening in September, 1891,—the date he could not state, he went with Mr. Gorman over his section to see the watchman of the bridge, Nels Mortinson, who was stationed six miles from Hinckley, and saw a fire on the north of the track, but could

not say how far it was from it, and saw no fire south of the track. The fire was about three miles from Hinckley. Never saw fire on the road but once. Could not say how far it was out from the road. Wind was from the south. Upon cross-examination he testified as follows:

"September, 1891, was dry; a very dry fall. Q. Were there not fires all around Hinckley during the early part of the month in the woods? A. Yes. I did not walk out much on the roads. Q. Weren't there fires all around in the woods? A. Yes. Q. When you went to see Nels Mortinson this night you speak of, three miles from Hinckley, there was no fire at all on either side of the track? A. I did not see any. Q. But at that time there was fire north of Hinckley in the woods? A. I did not see it up that way. Q. Do you know whether there was any fire in Hinckley? A. I didn't see it. Q. Do you know what time it was? A. I cannot tell what day it was. Q. After you went out there this night, did you ever see this fire down on the Great Northern road again, that you know of? A. No, sir. Q. Did you help to fight fire around Hinckley at all that fall? A. No, I didn't help. A couple of days I was out on the road we had fires in Hinckley. Q. A couple of days you were out where? Where did the fire that was in Hinckley come from? A. From the Mission creek, some place on the east side of the St. Paul & Duluth." Upon redirect examination: "Q. This fire that you speak of that you saw on the east of the St. Paul & Duluth road, when was that,—before you observed this other fire, the night you went down there, or afterwards? A. After that."

Mission creek is several miles south of Hinckley.

These two witnesses are the only ones testifying on behalf of the plaintiff who to any extent identify the fire in question, or saw it near the defendant's railroad track. It appears that the section of which Gorman was foreman extended six miles from Hinckley in a southwesterly direction, and ended at bridge 83, where it met Nelson's section running six miles beyond. Bridge 83 is directly south of the main body of plaintiff's land, and distant therefrom about four and one-half miles, and is the point where the fire came in from south of the railroad track and crossed it, about September 18 or 19, and went north in the direction of the plaintiff's main body of land. Mortinson testified: (1) That on September 17, 1891, just after defendant's train passed, he saw fire a half mile east of bridge 83 (this would be five and one-half miles from Hinck-

ley).   (2) That on September 15, 1891, he saw a fire on the Nelson section, on south side of railroad track, which in two or three days after September 17 came in on the south side of bridge 83, crossed the track, and went north.   (3) That two or three days after September 17 he helped fight fires at Hinckley, which came in from the south.

Here are three separate and distinct fires, all occurring about the same time; and, notwithstanding Mortinson's business was to watch fire all along the Gorman section, it is not shown by him whether the Hinckley fire was the one claimed to have been started by defendant's train, or whether any of the fires united, or where they went, except one went north, so far as he knew.   Nor was any attempt made to show by this witness any definite or particular distance either of these fires went.   In these particulars, which were material, no witness appears to have had the opportunity of Mortinson of observing these fires, and yet he says that he did not even know that the fire started by the train reached Hinckley at all.   He could not tell, yet it was his express business to watch the track and bridges.   His testimony was not materially strengthened by that of Hawkinson.   If the plaintiff's case rested upon the testimony of these two witnesses, there would certainly be a complete failure to trace the fire in question to its source.

Was this lack of evidence supplied by the additional testimony of other witnesses?   The principal damage was done by the fire on Tuesday, September 22, 1891.   W. J. Cathcart, sworn for plaintiff, testified that about September 17 he saw a fire southwest of Hinckley, but did not then know where it was located.   Somewhere about September 21, in the afternoon, it was in section 27, township 41, range 21.   Saw fire there among some old cuttings. It was a slow fire, just smoldering along east and west as well as making north and south; and the next day a wind sprung up, and carried it north, and in all directions, and burned everything before it.   He was in Hinckley at the time.   He went to section 27, and went from there down to the defendant's railroad track to a point about half a mile or three-fourths of a mile from Hinckley. Says there was no fire north or south of Hinckley September 22. It does not appear that this witness saw any fire near the railroad

track, either on the north or south side thereof, when he came there from section 27; and he made no effort to trace the fire to its source, although his principal business was to look after plaintiff's timber.

F. B. Rowley, sworn for plaintiff, testified that on Sunday, September 20, 1891, he was down on the defendant's track about four miles, and observed a fire burning on the north side of the track, about 60 or 80 rods therefrom, and four miles west of Hinckley; but the fire was not running either way when he was there. It had run into a swamp of green tamarack, but west of him there was a big smoke north of the track. Where the fire was in the tamarack swamp it had run at least half a mile north of the track.

H. B. Davis, sworn for plaintiff, testified that he was vice president and general manager of the plaintiff, and owned one-fourth interest in the plaintiff company, which was operating a sawmill and planingmills at Hinckley in 1891. On September 17, 1891, he observed smoke down on the Great Northern Railroad southwest from Hinckley. Watched it grow larger from day to day. September 21 saw fire getting larger, and sent Mr. Cathcart to look after it, and later in the day went to look after it himself. The fire from the west came through heavy timber, and was 100 rods to half a mile from him, and about a mile and a half from Hinckley. Fire got into Hinckley on September 22, but did not remain long. Passed northeasterly on that day. Although he had been north of Hinckley several miles the day before, he saw no fires. Took no steps personally to trace this fire for several days, and then went west several miles from Hinckley, and then over other parts of the land where the plaintiff's timber was burned, and found the territory all burned over.

It is a notable fact in this case that, while this witness was heavily interested as a member of the plaintiff company, and started out to trace the fire to its source, he did not go within several miles of where plaintiff alleges it originated, and where the witness himself testified he had seen smoke several days southwest of Hinckley, and where the fire destroyed timber, and when he had as much evidence to satisfy himself as to the origin of the fire as at any time since. Whatever probative force there may be in his evidence

is weakened by his own conduct in this respect, and by the further fact of the long delay in not presenting his claim, or saying anything about it to the defendant, and especially in waiting until after the great Hinckley fire, which passed over this same scope of territory three years thereafter, and had obliterated very much, if not all, of the physical evidence of the origin of the fire. While plaintiff had a right to bring its action within the period fixed by the statute of limitations, yet its conduct, as appears from the record, may be considered as affecting the credibility of one of its principal owners, familiar with all the facts and a witness in the case.

William Kelly, sworn for plaintiff, testified substantially as follows:

Was building a dam for the Brennan Lumber Company in the month of September, 1891, on section 34, T. 42, R. 21, and fire struck me September 22. A couple of days before the fire I could see a little smoke in the pine timber, coming from nearly a southwest direction. The fire swept by me to the north.

Had not seen any fire to the east, north, or west of him. After the fire was over, he went south to section 4, township 41, range 21. The territory he went over was all burned.

Several other witnesses testified in behalf of the plaintiff as to territory where this timber was situated being burned over, and that they worked in the timber south of Hinckley subsequent to the fire, but saw no indications of a previous fire. None of them, however, traced the fire to the point where it is claimed by the plaintiff to have started.

We now come to an examination of the evidence introduced by the defendant. Thomas Gorman was its section foreman in September, 1891, on the first section running southwest from Hinckley, and which ended at bridge 83. He testified:

"My section runs from Hinckley west six miles. Stops at bridge 83. I remember between the 1st and 20th of September, 1891, of a fire being on the south side of the track. It crossed from the south side of the track to the north side at bridge 83. I remember of their fighting fire at Hinckley. * * * I had observed the smoke or fire on the south side of the track about eight or ten days, probably, before it crossed. This fire crossed at the noon hour.

We were on track repairs there. When that fire crossed there, it crossed the length of 10 or 11 telegraph poles. The telegraph poles are probably 200 feet apart; probably not so far. * * * I wanted to get down to the bridge, and I couldn't get through till the fire went by. The fire was too strong across, too hot; no man could get through, and live through it. The wind was blowing a pretty strong gale from the south,—blowing from the south. This fire had been burning a number of days south of the track. I know Nels Mortinson. Nels Mortinson had been working for me that month. Whether he had been working for me all that I could not tell. There had been some men working for me. I remember seeing a train going along that track, and, shortly after the train went along, of seeing smoke start up. That smoke started at bridge 87, about two miles, or a little over, west of Hinckley,—southwest of Hinckley. It would be about within three miles of bridge 83— probably three and a half miles east of bridge 83—where this fire crossed the track."

He also testified that the smoke which he saw after the train passed did not come from the fire which came up and crossed the track at bridge 83.

John Stanchfield, a witness for defendant, also lived at Hinckley in September, 1891, and testified:

"In the month of September, 1891, I observed forest fires around Hinckley. Somewhere from the 5th—I can't place the date exactly, but between the 5th and 10th—I observed fire on the northeast of the northeast of section 13—41—21, somewhere about in this location [indicating], the northeast of the northeast of 13—41—21. The reason I saw it was I had on—I am not positive which quarter it was on—some three or four tons of hay in cock ready to stack. It was piled up there, and I was mad to see on that day a fire spring up on that section. Told my wife I was afraid of my hay out there. Went up after I ate my dinner. Found the fire got close to the Duluth Railroad, and it run in, working into this tamarack swamp, and was burning the swamp. The next day I got my hay out of there. The following Sunday from that day I was called up on the southwest of the southwest of 18 to a man that lived there, by the name of Michael Carey. The man he lived with then was burned up in the Hinckley fire in 1894. He sent a boy to my place, and wanted me to go up and help him fight fire, and save his hay; and that was on the west side of the Eastern Minnesota, in section 13. But we could not save his hay. His hay was burned up on that Sunday. Am certain it was the first Sunday after I saw fire break out. I am certain that the fire never was out between the St. Paul & Duluth Railroad for at least two or three weeks after this. I

77 M.—24

saw the fire. Am certain the fire was in there. Saw it evening; saw it in the trees. * * * I remember September 22. With reference to that date, I was fighting fire on the south and southeast side of Hinckley at least a week or ten days prior to that time. I knew there was a fire at one time between the point of fighting fire there and the 22d, and I am positive that it was at least a mile and a half on the road that goes down,—follows the Grindstone river there east, down the course of the river. I went down there, and looked after some hay. And at that time—I think probably the 16th—I rode down there one evening, and the fire was on both sides of the road. * * * From the 1st to the 22d of September the condition of the ground was very dry. The atmosphere was dry. Usually all through that timber the mornings were very smoky; that is, for at least a week or ten days prior to the 22d it was a dense smoke; that is, in the morning,—every morning. During the nights and evenings of that week, or ten days prior to the 22d, I observed fires in the woods surrounding Hinckley. On the 13th and 14th I could not say whether they extended north of 12 or not, but in north of Hinckley and northwest of Hinckley. In the evening the fires would not be badly running. The wind would die down, and there would be dry trees, and that we would see from the house. It showed there was fire all through that country, in 13 and 14 at least. I did not go any further than the two sections 41—21."

Upon his cross-examination he testified that he observed the fire on section 13 from some day between September 5 and September 10 until September 26, and, as near as he could locate the same, it was on the northeast quarter of the northeast quarter of section 13, close to the St. Paul & Duluth Railroad, and was sure that the fire was not out for two or three weeks. The section 13 to which the witness referred is directly north of Hinckley, and between it and some of the timber of plaintiff injured by fire.

John McNamara, a witness for defendant, testified that he was section foreman for the St. Paul & Duluth.

"Was living, in the month of September, 1891, at Hinckley. Section foreman for the same road. * * * Was over that section during all the month of September, 1891. I observed fires north of Hinckley on the east or west side of the railroad track during the month of September between the 1st and 22d of the month. I saw a fire cross the eastern track,—cross from the Eastern Railroad up to 17 or 18, and into 24, and up to 13 along by 12, and along by the railroad track to section 1, and along through there. I don't think that fire crossed to the west side of the St. Paul & Duluth track. I

noticed fires on the west side of the St. Paul & Duluth track. Could not say about the time. It was in the month of September,—about the middle of September. I could not give date. The fire I observed on the west side was in sections 36 and 25, 36—41 —21. Thirty-six is about four miles north of Hinckley. I saw a fire north of what is called the 'Big Hinckley Cut' on the west side of the track. It was about the middle of September. I recollect that Charles Peterson was working for me in the early part of September. He quit work between the 15th and 20th. Do not recollect the date. I observed these fires on both sides of the track previous to the time he quit work for me.  *  *  *  I saw a fire on the west side of the track about four miles from Hinckley. The fire that I saw about a mile and a half, in my opinion, never crossed the track. That was a separate fire. The fire that Peterson told us about was about a mile and a half up. I don't think it ever crossed the track. About four miles up was quite a fire. Burnt brush and tamarack and everything on the ground. There was a fire on the east side of the track at that point. It was on both sides. It was burning about a week altogether, on the east side. Couldn't say how long I observed it on the west side. I don't remember how long it was burning, but I saw the fire there. Further than that I don't remember anything particular about it."

Charles Peterson, sworn for defendant, testified as follows: He lived at Hinckley. Worked on section 14 with Mr. McNamara, for the St. Paul & Duluth, north of Hinckley. Between September 1 and the day he quit work, on the 17th or 18th of the same month, he observed forest fires north of Hinckley,—some time in the first part of September,—fire in a big swamp about a mile and a half north of Hinckley. It was on both sides of the track. The fire kept on going. Drove it off towards the northwest into the woods. When he quit work, on the 17th or 18th, that fire was, as far as he could see, burning in the woods north of Hinckley. Could see it climbing up dry pines, and lots of smoke. That he laid out nights to watch the fire east of Hinckley. That the fire on the north of Hinckley was about a mile and a half just the other side of the track.

N. A. Greenfield, sworn for defendant, testified: That he is a farmer, and lives in Dell Grove. Was there during all the month of September, 1891. Between the 1st and 20th he observed fires in the forest up in that country. That in September, 1891, he lived on section 25—42—21. That about the 9th or 10th fires were quite

bad south of him. Somewhere about the 15th or 16th the fire got quite bad south of him, and McNamara notified him he had better go away; he was in danger. That his wife and family did go away, but he stayed there. That his house was located about the middle of the S. E. of the S. E. of 25—42—21. Stayed to fight for his house. The fire burned into it; struck the high land. Was in the swamp when notified. That at the time his family moved from 25 to 24 there was fire burning on the west side of the St. Paul & Duluth track. That fire burned that day, through different portions of the country, to section 25. That he lost hay and other property by fires up there. Burned the day he left,—about the 15th or 16th. During the month of September, and prior to the 20th, there was smoke in anywhere that you could look. It was all smoke. He fixes the date by the birth of a child born on the 2d day of the month.

Henry Lund testified in behalf of defendant that in September, 1891, he was living on section 24—42—21, and that about September 15 or 16 he had seven stacks of hay destroyed by fire that came up from the south. Kept burning right along past him. He and a man by the name of Samuelson tried to stop it, but could not. It burned the low lands and marshes. Had a sawmill there, and was afraid, if the fire got in there, it would burn it.

Several other witnesses sworn on behalf of defendant testified as follows:

William Jacobs testified that he lived on section 7, township 42, range 20. Fire came in between September 1 and 20, 1891, from the south, and burned his hay, and there were fires burning from the first week in September to the east on the northwest and south of him.

H. G. Tyler testified that he lived on section 24, township 42, range 21, and that fire first came from the west to his place September 20, which he, with six or eight other men, fought with water, and put out the flames, but it burned in the underbrush, and the next morning it turned.

Warren Cathcart testified:

"Live at Hinckley, Minnesota. Common laborer. Was there in

the month of September, 1891, working for the Brennan Lumber Co., near Grindstone Lake, in John Bell's camp. He was cutting roads. Could not say in what direction. I was cookee,—helping the cook. Had to take dinner out in the woods to where the men were. Crew about 20. Commenced the last of the first week in September. Took dinner out for two weeks. About three miles, I think. The camp was by the end of the lake. It was dinner I had to take out. They would eat it between 11 and 12 o'clock. To prepare this lunch, when I found the men I would start a fire, and prepare the kettle. Did that every day. I took no pains to put out the fires as I started them. They were nearly burned out by the time the men got through dinner. Q. Did you notice ever, in passing over the route where you had built the fire the days before, or any number of days before, whether the fire had spread around? A. Yes, sir. Q. How far had it spread in any case you noticed? A. From four to six feet in diameter, spots as big as this room; only on one occasion saw a spot as big as this room. I needed to carry out lunch until camp burned. Was in camp when it burned. Think it was the day before I carried out lunch in this way to the men. Built a fire at that time, and left it as I had the other fires. The day before that, carried out lunch. Prepared tea, and built a fire, and left it. Was not back to the place I built the fire on the last day. Saw no evidences of fire in that country before the camp was burned up."

L. Y. Thydeen, on his cross-examination, testified for defendant as follows:

"I live on section 2—39—23, about a mile and a half from the Great Northern Railroad south, about 14 miles from Hinckley. Pokegama is eight miles from Hinckley. The fire reached my place on the 16th, going in a northeasterly direction. I know where that fire started. It started in section 22, town 29, range 23. I know when it started. It was on September 8. Am sure it reached me the 16th. I left my place on the 19th. I went first up to the railroad track, then followed the railroad track about a mile east from Mud Creek bridge. The whole distance would be two miles. I went up the road about two miles. Then went to where I saw the fire. It was east along the railroad line about the corner of section 25—40—23. I followed the track. 1 went first a mile and a half up to the railroad track, and then proceeded up the railroad track three miles. I stopped when I came to where the fire was. That is where I found the fire. Q. Before you got there, you could not see—could not judge—which side of the road the fire was on, could you? A. No, sir; I could not before I got nearer. Q. When you got up there, you found fire on both sides, did you? A. No; I found it on one side when I came there. It was on the south side.

That was on September 19. It crossed while I was there. The wind was blowing from a southwest direction. The fire proceeded as long as I saw it. I returned home. I started out two weeks afterwards. As far as I went on the 19th was to go about a mile and a half north, and then up on track two miles; then came home."

Numerous other witnesses testified in behalf of the defendant, tending in a greater or less degree to support its theory that there were other fires in the region of this timber from which the fire which destroyed plaintiff's timber might have originated, but the testimony is too voluminous to be further quoted. We have examined the evidence with great care, and we do not trench upon the province of the jury in permitting it to weigh conflicting evidence, and render a verdict accordingly, when such a case is presented. This, however, is not such a case, but one where it conclusively appears from nonconflicting evidence that the plaintiff failed to trace to its origin or source the fire which caused the damage to its timber. The language used by Justice Mitchell at page 192 in Baxter v. Great Northern Ry. Co., 73 Minn. 189, 75 N. W. 1114, is quite pertinent to this case, viz.:

"Under such circumstances it was necessary that the fire should be carefully traced and identified by the evidence from the right of way to plaintiff's premises. The jury were not at liberty to arrive at the result by mere guess or conjecture, but must have had some substantial evidence on which to base their verdict. We have carefully read and studied the evidence, and are clearly of the opinion that there was no sufficient tracing of the fire, either by any one witness or by all the witnesses together, from the point where the sectionmen ignited the pile of ties and rubbish on the right of way, to plaintiff's premises. Neither was it traced by proof of facts and circumstances from which the inference could be legitimately drawn that it was the same fire. The most that can be claimed for the evidence is that it is possible that the fire started on the right of way might have been, in whole or in part, the fire which consumed plaintiff's property."

The plaintiff had ample opportunity to have traced this fire to its source immediately after it occurred. It was running its sawmill and planingmill at Hinckley at the time with a large force of men, not far from where the fire originated, and not far from the locus in quo of the damage. It had several lumber camps upon the very

land where the fire ran over its timber, and one of these camps was destroyed by the same fire as that which injured its timber. Davis, the general manager, says that when he received word from the various men that the fire had gone through there he took steps to trace it, but he never went near the place where he claims it originated, nor near the place where the fire started that crossed at bridge 83, and which went north in the direction of plaintiff's land. Nor did he send any one of his large number of employees to trace this fire to the place of its origin. The complex situation as to the various fires in that vicinity or region, and plaintiff's failure to trace this one to its source, must have left the case one where the jury could not, as a legitimate inference from all the facts, have rendered a verdict properly in favor of the plaintiff, and hence the order denying defendant's motion for a new trial is reversed, and a new trial granted. So ordered.