Bevis, J.
 

 Three errors only are complained of:
 

 (1) That the members of the jury were allowed unlawfully to separate while they had the case under consideration.
 

 (2) That the court accepted the verdict of the jury after two of its members, upon poll, expressed doubt or uncertainty as to their adherence to it.
 

 (3) That the court, upon motion- for new trial, re
 
 *236
 
 fused to hear the evidence of jurors tending to prove that the bailiffs in charge of the jury had had unlawful communication with some of its members, to the prejudice of the accused.
 

 The Court of Appeals found that no error was committed in any of these respects.
 

 We shall consider the grounds of error in succession.
 

 (1) Section 13448-1, General Code (113 Ohio Laws, 194), now permits a separation of the jury under proper supervision, at the court’s discretion, and the Ohio cases cited by the plaintiff in error were all decided prior to the enactment of this provision. The practice of allowing such separation, especially in criminal cases, should be carefully guarded, and perhaps in the instant case there was some laxity on the part of the bailiffs. Upon one occasion eleven of the jurors were taken to breakfast, leaving one alone in the courtroom, open to access by outsiders. No definite prejudice to the accused appears to have resulted, however, and we do not disturb the judgment of the Court of Appeals in this respect.
 

 (2) When the jury’s verdicts were read in court, a poll was demanded by the accused. Ten of the jurors* upon interrogation, replied that the verdicts were theirs. As to the other two, Mrs.-Ann M. Leiter and Mrs. Clara T. Miller, the record shows the following:
 

 “By the Court (to Juror Miller):
 

 “Q. Mrs. Miller, is this verdict which has been returned in open court your verdict? A. Well, I didn’t want to sign it that way.
 

 “Q. What is that? A. I didn’t want to sign it that way.
 

 “Q. Is it your verdict? A. I signed it; yes, sir.
 

 “Q. It is? A. I signed it.
 

 “Q. What is that? A. I signed the verdict.
 

 “Q. And it is your verdict? A. Well, I suppose if I signed it it would be.
 

 “Q. I want to know if that is your verdict now.
 
 *237
 
 You ought to know if it is or not; is that your verdict? A. Well, I don’t know. * * *
 

 “Q. Is it not your verdict? A. In my heart I don’t feel entirely satisfied with it.
 

 “Q. You say that it is not your verdict? A. Well, I suppose you could call it that.
 

 “Q. What is that? A. I suppose you could call it that.
 

 “By the Court: Q. How about you Mrs. Leiter? A. Mine was because the majority rules is all.
 

 “Q. I don’t want to know the majority rule, I want to know whether that is your verdict? A. It is my signature and my verdict; yes. (Thereupon counsel confer with court at bench.)
 

 “By the Court: Q. Mrs. Miller, we are a little confused as to your attitude. I should like to ask you •this question in a larger form, but I am compelled to ask you in the language of the statute. Is or is not this verdict your verdict? A. Yes; it is.”
 

 While undoubtedly the court in this circumstance would have been warranted in sending the jury back to its room for further deliberation, we cannot say that there was error in receiving the verdicts. Neither of these two jurors denied that the verdicts'were hers. Although both indicated somewhat unsettled states of mind, both, after prolonged discussion in the jury room, had signed the verdicts, and each in open court, after full opportunity to say otherwise, said that the verdicts were still hers. No coercion or undue pressure on the part of the trial judge appears. After discussing this feature of the case, the Court of Appeals said:
 

 “We have no hesitancy, therefore, in deciding that the trial court rightfully accepted the verdicts upon the completion of the polling, as being the true ascertainment by all the members of the jury of the question submitted for their determination, namely, whether the defendant was or was not guilty.”
 

 
 *238
 
 In this judgment of the Court of Appeals we likewise concur.
 

 (3) The jury, at the conclusion of the hearing, retired to deliberate under the charge of Robert Oatley, the regular bailiff, and Ernest Richardson, clerk of the court, acting as special bailiff.
 

 Upon the motion for new trial, the testimony of one Hamel was offered by the accused, that one of these bailiffs, immediately after the jury was discharged, had said, “That ‘By God, he had told that jury in the morning and again at noon that they must arrive at a verdict.’ ”
 

 This testimony was rejected by the court, and exception taken.
 

 In connection with the foregoing, the accused offered affidavits of Mrs. Clara T. Miller and Mrs. Ann M. Leiter, jurors in the case. The record shows that after some four hours’ deliberation, the jury were called into court and taken by the bailiffs to the Elks’ Club for supper. At this time they stood nine for acquittal, one for conviction, and two in doubt. The affidavits of Mrs. Miller and Mrs. Leiter purport to prove the happening of certain events thereafter. Part of Mrs. Miller’s affidavit is as follows:
 

 “On our way to the Elks’ Club I walked with Mr. Richardson at the head of the jury at which time the following conversation took place:
 

 “I remarked -that I was glad to be out, * * * that we had quite a terrible session and he asked me how the vote stood and I said ‘Nine to three.’ And then he remarked that it was fine. Then he asked me to tell him which way we were going, what that nine to three meant, and I told him it was for acquittal and that is all that was said. Then Ann Leiter walked up to us. We then had our dinner at the Elks’ Club. * * * Then I don’t know who started the conversation again. I don’t remember whether I did or whether Ernie did. But he asked then, ‘Did you say
 
 *239
 
 that the jury is nine to three for acquittal?’ I said, ‘Yes.’ He said, ‘My Grod, you are all wet. Judge Stahl expects you to return a verdict of guilty and if you don’t it will be just too bad,’ and I said, ‘He does?’ I said that there was not enough evidence there to show me that he was guilty and he said, ‘Grood Lord, what evidence do you want? It is all there. You better look at your books.’ ”
 

 Mrs. Miller’s statement further shows that she told Mrs. Leiter of the occurrence above set forth, and also a Mrs. IGoons, another juror. Quoting Mrs. Miller’s affidavit still further:
 

 “At breakfast, at the same table sitting with me was Mrs. Leiter, Mr. Turner and Mr. Eichardson, and the subject of not getting any place with our ballots was brought up and Mr. Eichardson spoke and said, ‘Of course I don’t know which way the vote is going,’ which was untrue because he did know the night before, ‘but’ — he said * * # ‘Why not switch your votes from whichever way they were going to the other way, ’ and he said, ‘ One of you will hold out, ’ and then he said, ‘in that way you will get the different jurors to talk and you will find out their views and their reasons on the subject.’ * * * Then he said, ‘If their reasons sounded logical and sound fair to you,’ he said, ‘stick with them.’ ‘ He said, ‘If you don’t, what difference does it make anyway.’ And he said, ‘You got to bring in a verdict.’ Mrs. Leiter said, ‘If we don’t bring in a verdict, then what?’ ‘Well then,’ he said, ‘we probably would have to see about getting your clothes and make different preparations for the night again.’ # * *
 

 “All of the jurors were seated at the one table and someone remarked, I don’t know who, saying we were having an awful time reaching a verdict and Mr. Oatley spoke up and said, ‘For Gfod’s sake, you will have to reach a verdict tonight.’ I did not pay much attention to what he did say, but Ernie popped up on that
 
 *240
 
 and lie said, ‘Yes, you got to reach, a verdict, all of you.’ ”
 

 The affidavit of Mrs. Leiter, offered by the accused, reads in part as follows:
 

 “On the way back to the court house I walked with Mr. Richardson at the rear end of the jury and the subject of the verdict was brought up, and I told him that I simply — after all my study the night before— could not find any real evidence, or enough evidence, and I said everything that Linton Fallis said and everything that Miss Davis said and everything that Miss Stone said related to Helen Johnson. I said it was all laid to Miss Helen Johnson and she never was brought on the witness stand, and Ernie then told me that Helen Johnson was dead; she could not be brought on the witness stand. ‘Well,’ I said, ‘we did not know that.’ He said, ‘Well, you can tell them when you go back.’ I said, ‘How could I go back there and tell them a thing like that; where would they think I got it at this time of the day because the subject was brought up the night before and nobody knew anything about it.’ ‘Well,’ he said, ‘just tell them that you imagine she is dead’ and I said ‘I don’t know how I could bring that up.’ ”
 

 On motion for new trial, the foregoing affidavits were tendered, and the persons making them were produced in court and offered as witnesses. The court refused to receive either the affidavits or the testimony of the witnesses', which refusal is now assigned as error.
 

 Section 13448-1, General Code (113 Ohio Laws, 194), provides:
 

 “When a cause is finally submitted, the jurors must be kept together in a convenient place, under the charge of an officer, until they agree upon a verdict, or are discharged by the court. * * * Such officer shall not permit a communication to be made to them, nor make any himself, except to ask if they have
 
 *241
 
 agreed upon a verdict, unless by order of the court; nor shall he communicate to any person, before the verdict is delivered, any matter in relation to their deliberation.
 

 From the foregoing it appears that, if the statements of the witnesses offered are true, acts of the gravest impropriety were committed by the bailiffs having the-jurors in charge. According to these statements, the jurors were given to understand that the judge wanted them to find the defendant guilty. They were told that they must reach a verdict, or be again locked up for the night. They were told that Helen Johnson could not be produced on the witness stand because she was dead, a statement without any support in the evidence. That these statements may have had some influence on the final verdict of the jury cannot reasonably be denied.
 

 Was this testimony admissible in evidence upon the motion for a new trial? The trial court ruled that it was not, and this ruling was upheld by the Court of Appeals, although apparently with misgivings, upon the authority of
 
 Schwindt
 
 v.
 
 Graeff,
 
 109 Ohio St., 404, 142 N. E., 736. In that case, an action to set aside a will, two of the jurors tossed coins to reach their decisions, and this court held that the evidence of jurors, even of jurors dissenting, could not be received to impeach the verdict.
 

 Judicial expression of this general rule runs back, through the reports to a very brief opinion of Lord Mansfield in 1785. In
 
 Vaise
 
 v.
 
 Delaval,
 
 1 T. R., 11 (K. B.), the affidavit of a juror was offered to prove that the jury had tossed coins to determine their verdict. Lord Mansfield’s entire opinion was as follows:
 

 “The Court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every case the Court must derive their knowledge from some other source, such as from some person having seen
 
 *242
 
 the transaction through a window, or by some such other means.”
 

 In broader or narrower form, this rule has gained currency in most of the American jurisdictions. 46 Corpus Juris, 354
 
 et seq.
 

 In Ohio, despite the apparent apprehension of several of the judges that it sometimes served the cause of injustice, the rule that jurors’ testimony alone could not be received to show misconduct of jurors in the jury room has persisted through a line of cases for more than three-quarters of a century.
 
 Farrer
 
 v.
 
 State, 2
 
 Ohio St., 54;
 
 Kent
 
 v.
 
 State,
 
 42 Ohio St., 426;
 
 Goins
 
 v.
 
 State,
 
 46 Ohio St., 457, 21 N. E., 476;
 
 Schwindt
 
 v.
 
 Graeff, supra.
 

 The courts have adhered to the rule on grounds of public policy, fearing that its abrogation would entail consequences worse than does its enforcement.
 

 The Ohio cases, however, and most of the cases in other states, hold that if a foundation can be laid by testimony
 
 aliw'ide
 
 that the jurors were guilty of such misconduct as to warrant setting aside the verdict, the evidence of jurors in corroboration and amplification thereof may be heard. Plaintiff in error in this case seeks to bring himself within this phase of the rule by offering the testimony of Hamel,
 
 supra,
 
 that one of the bailiffs had said that he had twice told the jury they must return a verdict. Whether under our prior decisions this testimony would be sufficient foundation for the affidavits of jurors as to their own misconduct in the jury room may be doubted.
 

 But plaintiff in error contends that the communications made to members of the jury did not take place in the jury room, or while the jury was deliberating, and that jurors’ affidavits may be received to prove misconduct on the part of the bailiffs in charge,' as distinguished from misconduct of the jurors in their deliberations. Where the officer’s words or acts are such as reasonably to sustain an inference of prejudice
 
 *243
 
 to the losing party, there is respectable authority to support this contention of the plaintiff in error.
 
 Rickard
 
 v.
 
 State,
 
 74 Ind., 275;
 
 Coolman
 
 v.
 
 State,
 
 163 Ind., 503, 72 N. E., 568;
 
 State
 
 v.
 
 Crafton,
 
 89 Iowa, 109, 56 N. W., 257;
 
 Dansby
 
 v.
 
 State,
 
 34 Tex., 392;
 
 Taylor
 
 v.
 
 State,
 
 18 Ala. App., 466, 93 So., 78.
 

 This view, however, logically involves a wider inquiry. If, for example, the affidavit of a juror may be received to show that a sheriff or bailiff made statements to jurors from which prejudice may be inferred, may not such affidavits be received to show acts done or communications made by persons other than court officers? That injustice to a litigant should be effected through the misconduct of an officer sworn to protect that litigant’s rights is, of course, especially reprehensible ; but the effect upon the litigant’s fortunes is the same whether the prejudice accrues through the agency of a court officer Or of another.
 

 We are impelled, therefore, to a consideration of the basis of the whole doctrine. What are the “highest considerations of public policy,” so frequently referred to by the courts in justification of their holdings ?
 

 In an illuminating section on The Formation of Opinion and Trial by Jury, found at page 68 of his scholarly work on Public Opinion in War and Peace (1923), Abbott Lawrence Lowell, himself a distinguished lawyer before he became president of Harvard University, says:
 

 “Lastly, in order to insure that the verdict expresses an opinion on which reliance may be placed, it must be unanimous, and herewith is connected a device calculated to prevent jurymen from prematurely making up their minds, and thereby rendering change of opinion difficult until a final agreement is reached or proves to be unattainable. That is secrecy of deliberation. Until the jury are discharged, their differences are unknown outside their own room, hence
 
 *244
 
 a juryman has little of the pride of opinion which prevents change. When men consult in private, and know that they are expected to agree they are apt to express their views in a tentative way, to heed one another’s opinions, and to compromise and draw together until they do agree in their conclusions.”
 

 This book, of course, is not “authority,” but it may serve to point out a path among the books which are authority.
 

 If the protection of the secrecy of deliberation be the real object of the rule in question, much in the decisions that otherwise seems hard to understand becomes clear enough. Lord Mansfield’s ruling that the jurors should not be allowed to inform on each other, but that their misconduct might be shown by the testimony of some one who peeped through a window, becomes intelligible if his object was to protect the privacy in which the jurors might argue each other into final agreement.
 

 The subsequent holdings of other courts that the testimony of jurors might be received as to their own misconduct, if evidence
 
 aliunde
 
 were first presented, serve merely to narrow the scope of Lord Mansfield’s original rule, which was felt to go too far.
 

 Refusal to receive the evidence of jurors to “impeach their verdicts” is sometimes grounded on the premise that to do so would open up interminable inquiries. But this argument proves too much. The same result would follow the receipt of jurors’ evidence after the foundation for it had been laid by evidence
 
 aliunde,
 
 a practice followed in nearly all the courts.
 

 If, however, protection of the .privacy of deliberation be regarded as the chief end to be subserved in this connection, there seems to be no good reason why jurors may not testify as to events transpiring outside the jury room, or which constitute no part of their deliberations. The possibility that any of their num
 
 *245
 
 her might be called upon, to testify concerning unwarranted communications made by court officers or others would put no damper upon the give and take of deliberation, so necessary to final agreement. This view of the matter has found substantial expression in many well-considered cases. -31 L. R. A. (N. S.), 930, note.
 

 Perhaps the most authoritative expression of this view is found in the opinion of Fuller, C. J., in
 
 Mattox
 
 v.
 
 United States,
 
 146 U. S., 140, 13 S. Ct., 50, 36 L. Ed., 917. In that case affidavits of two jurors were offered to the effect that, among other things, the bailiff in charge of the jury had said, in their presence and hearing, “This is the third fellow he has killed.”
 

 In his opinion, the Chief Justice said:
 

 “A juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind. * * *
 

 “We regard the rule thus laid down as conformable to right reason and sustained by the weight of -authority. These affidavits were within the rule, and being material their exclusion constitutes reversible error. A brief examination will demonstrate their materiality.”
 

 To hold in accordance with this view does not require the overruling of any of the actual, prior decisions of this court, with the possible exception of
 
 Hulet
 
 v.
 
 Barnett,
 
 10 Ohio, 459. In
 
 Schwindt
 
 v.
 
 Graeff, supra,
 
 as hereinbefore mentioned, the misconduct complained of (tossing up a coin) was that of the jurors themselves while engaged in their deliberations. In
 
 Goins
 
 v.
 
 State, supra,
 
 ballots were put in a hat, twelve marked for manslaughter, and twelve for second-degree murder, and the verdict was arrived at by drawing out these ballots. Here also the misconduct was within the jury room, and constituted part of the
 
 *246
 
 jury’s deliberation. In
 
 Kent
 
 v.
 
 State, supra,
 
 the evidence offered showed that one of the jurors disclosed for the first time in the jury room after the case was submitted that he had personal knowledge of the facts in the case. So here again the misconduct related solely to a transaction within the jury room during deliberation. No outsiders were involved. In
 
 Farrer
 
 v.
 
 State, supra,
 
 it was made to appear that the jury, while deliberating, obtained possession of a newspaper article bearing on the trial. In this case, however, a foundation was laid by the testimony of others, and thereafter the court held that the affidavits of jurors were admissible.
 

 The only case decided by this court which might be considered as being in conflict with the foregoing is that of
 
 Hulet
 
 v.
 
 Barnett, supra,
 
 decided in 1841. In that case it appeared that a constable intruded into the jury room during the jury’s deliberations, and insisted upon stating his views, claiming that he was acting under oath as well as the jurors. There being no other evidence of this fact, the court refused to receive the affidavits of the jurors
 
 as to their own misconduct.
 
 Upon the question whether such evidence should not be received to show misconduct of the constable, the court expressly found that however reprehensible the constable’s actions may have been, they did not influence the jury in its verdict, inasmuch as he appears to have stirred up their indignation, and not to have gained support for his views. The court said: “There is not in reality any evidence of misconduct on the part of the jury.”
 

 There are, however, some expressions in the syllabus and in the opinion in the
 
 Eulet case
 
 inconsistent with our holding in this case. In so far as such expressions are in conflict with the present holding, the
 
 Eulet case
 
 is overruled.
 

 Summarizing the foregoing conclusions, we are of the opinion that there is a public policy to be sub-
 
 *247
 
 served in protecting the privacy of the jury’s deliberations. That the end to be attained thereby is of even greater importance than the result in an individual case has been repeatedly held by this court. But, in our opinion, this policy does not require that acts done or communications made to members of the jury, outside the jury room or apart from their deliberations, be similarly protected from disclosure by the jurors.
 

 We are, therefore, of opinion that the evidence offered in behalf of the accused upon the motion for new trial in this case should have been admitted, and that the refusal to admit it was error, for which the judgment must be reversed.
 

 Judgment of the Court of Appeals reversed, and cause remanded to the court of common pleas for pro-, ceeding upon motion for new trial not inconsistent with this opinion.
 

 Judgment reversed and cause remanded.
 

 Weygandt, C. J., Allen, Stephenson, Jones and Matthias, JJ., concur.
 

 Zimmerman, J., not participating.