[File No. 6436.]

JAMES TURNER & SONS et al., Respondents, v. GREAT NORTHERN RAILWAY COMPANY, a Corporation, and A. C. Maiers, Appellants.

(272 N. W. 489.)

Opinion filed March 27, 1937.

*Murphy, Toner & Kilgore,* for appellants.

*Bangs, Hamilton & Bangs,* for respondent.

BURKE, J. This is an action to recover the value of property claimed to have been burned and consumed by a fire started by sparks from the locomotive engine belonging to the defendant, the Great Northern Railroad Company, and operated by the said defendant at the time.

The property is alleged to have been of the value of $32,585.02. The property was all the necessary buildings for a sash and door factory located on block 27 of McCormick addition to the city of Grand Forks, North Dakota. The first building nearest the railroad was the warehouse with two lower buildings attached and running nearly parallel with the railroad. The first of the lower buildings was called the moulding shed and the second a strip shed. Southeasterly from the warehouse was a small building for paint and oil. East of the warehouse was a driveway thirty-four feet wide, extending between the warehouse and the mill. On the west side of the mill and shop was a platform open on the face but with a roof over it and extending across towards the rear end of the warehouse and factory there was a bridge connecting the two buildings on the second floor. The rear end of the platform on the west or southwest side of the mill was inclosed. At the back end of the mill was the office. A little northwest of the mill was a power house and back of the power house was a dry kiln. The Great Northern right of way is one hundred feet wide where it

passed the property. Where it passed the strip shed the center of the track was a little less than fifty feet from the shed, part of the mill property being on the right of way.

At 12:02 p. m. on April 17, 1932, Great Northern engine No. 718 left the yard with a box car destined for the Northern Pacific tracks. This engine passed the sash and door factory very soon after 12 o'clock at a speed of eight miles per hour.

Albert Ruthoske testified that after he ate his noon meal he saw an engine. It passed the sash and door factory. He stopped and felt the sparks coming across to his face. The engine slowed down after it went by the Turner factory. "I just buttoned up my suit. I didn't want to burn it up. This was a lone engine. There were no cars attached to this engine."

The railroad records show that there was an engine that went by the Turner property about that time the day of the fire but with a box car. Sometime between 3:15 and 3:25 in the afternoon of the same day engine No. 715 with thirty-eight empty box cars went by the sash and door factory at about eight miles an hour. The evidence shows that the track is on level ground and that the power necessary to pull that train of thirty-eight empty box cars was only one-third of the capacity of that particular engine, No. 718. It is conceded that both engines were equipped with all modern equipment for the prevention of fire but respondents claim that the evidence shows that even with the best modern equipment engines do emit sparks and cinders. What the evidence shows is that ashes and cinders will go through the flues but must go through the netting before they can escape from the stack and can't go through the netting until broken up.

The case was tried with great care, each side apparently trying to get the whole truth from the witnesses. The testimony was brought out by leading questions from both sides without objection. The witnesses mostly lived in the neighborhood of the sash and door factory. They arrived, of course, at different times. Some of them early and some of them later. Everything was very dry at the time. There was no snow and there hadn't been any rain. A great deal of the lumber on hand was kiln-dried. The buildings were mostly frame and burned very rapidly. Nobody saw the fire start. About a quarter of an hour after the last train went by smoke was seen.

The case was tried twice in the district court. On the first trial the jury disagreed. On the second trial the only question at issue was the question of the origin of the fire. Counsel for the defendant conceded that witness James Turner, secretary and treasurer of James Turner and Sons, was qualified to testify as to the value of the property consumed. He testified at length specifically describing the property and that the aggregate value of all the property consumed was $33,294.45. He was cross examined at great length about matters relating to the fire but was not asked a single question on cross examination as to the value of the property and there was no evidence offered by the defendants on the question of damages or the value of the property.

The court instructed the jury "If your verdict should be for the plaintiffs, you will then assess their damages. Evidence has been introduced by the plaintiffs tending to show that the total loss or damages suffered by the plaintiffs as a result of the fire which destroyed the buildings and other property of James Turner & Sons sash and door factory was of the sum of $32,585.02. . . . The defendants have introduced no evidence as to the value of the plaintiff's property destroyed by the said fire, . . . The court instructs the jury that you should, after considering all of the evidence in the case, fix the fair and just amount of damages suffered by the plaintiffs because of said fire, but not to exceed the sum of $32,585.02, and in your discretion you may or may not, as you see fit, allow interest on the damages awarded at 4% per annum from April 17, 1932. In determining the damages suffered by the plaintiffs you should allow the full value, as shown by the evidence, at the time of the fire of all the property of said James Turner & Sons destroyed by said fire, . . ."

The jury, after being out about twenty-eight hours, returned a verdict for the plaintiff for $10,000.

A motion for a new trial was made upon the following grounds, to-wit:

"1. Insufficiency of the evidence to justify the verdict and the judgment entered thereon and that the same are against the law.

"2. That the evidence in the case is of such a character that the·

verdict of the jury should be set aside as a matter of discretion by the Court.

"3. That the bailiffs in charge of said jury during the trial of said case made statements to the jury during its retirement and while considering the case, that they must agree upon a verdict and that the Court would not accept a disagreement or permit the discharge of the jury until an agreement was reached.

"That thereby, irregularity and misconduct occurred in the proceedings of the Court and the jury in connection with said trial."

The motion was denied and from the order denying a new trial and from the judgment the defendants appeal specifying all the grounds urged on the motion.

The first question raised by appellants is the insufficiency of the evidence to sustain a verdict.

"The plaintiffs rely upon the prima facie presumption that the fire was set by sparks escaping from a locomotive of the defendant.

"To have the benefit of this rule (appellants claim that) it was incumbent upon the plaintiffs to exclude all other probable causes of the fire. *That is,* to show that there were no other causes to which it would be just as reasonable to attribute the fire.

"It is our contention that under the evidence in this case it is just as likely that the fire occurred from (1) Spontaneous combustion; (2) Exposed wiring, or (3) Lighted cigarette stubs thrown among the débris by boys playing upon the premises, as by sparks from a passing locomotive."

James Turner testified: "I did not notice the bridge when I arrived. The smoke was in the north end of the building. When I got there the rear end of the warehouse, which would be the strip shed and the moulding shed, was blazing and burning near the roof when I first saw it. I went into that jog where the firemen were working. They had a hose in the front window of the mill. I could see what they were doing. They were right under my eyes. I went to these firemen who were putting water into the mill. I watched what they did and then I went to the front of the office and we broke a window into the office."

A number of witnesses testified that when they got to the fire the strip shed, the building nearest the track, was all ablaze; but from

a careful examination of all of the evidence it is clear that the fire first started in the mill and that it spread from the mill over to the other buildings by crossing the bridge.

Oscar Johnson, Mrs. Oscar Johnson, and Mrs. Luella O'Neil were at 608 North Seventh Street and must have been among the very first at the fire.

Oscar Johnson testified: "My attention was called to the fire. Looked out the window and saw the flames through the window of the sash and door factory. The east building next to Seventh Street. We went out on the porch and all at once it burst through the top of the roof. I went down to the park and the fire department was there when I came back. It burned very rapidly."

Mrs. Oscar Johnson testified: "I am looking out the window and I saw the windows in the mill were red. That is the first I saw and then we went out on the porch and could see that there was a fire in the building. So we went to look for the little boy. Went down to Sixth Avenue and then we turned and went west and then we turned and went down between the tracks and the warehouse to Sixth Avenue and then we came down Sixth Avenue and we came up in front of the warehouse and mill and we stopped for a second in front, and by that time flames had burst out on the side of the mill back of the office."

Mrs. Luella O'Niel testified: "Mrs. Johnson called attention to the windows being red in the mill. I looked and the windows were all red. I went out onto the porch and noticed my nephew wasn't there and we went to look for him. Went down Seventh Street, turned to the left and went to a driveway between the track and mill. We went between the railroad track and the warehouse. We stopped a second between the two buildings, the mill and the warehouse on the north side. We saw flames coming out from about the middle of the mill. We could see the side of the warehouse but couldn't see any fire or smoke on that side. We left at once to look for the boy."

One of the first witnesses on the scene was Barney Ebertowsky. He was at his garage at the back of his lot fixing a tire when his attention was attracted by the smoke. He testified: "I went in the house and called the fire department and then I went right to the fire. There were just a few 'kids' there, five or six. There was no fire in the warehouse, the building next to the track. I am familiar with the

driveway between the mill and warehouse. I was right across the street south, between the two buildings and had a clear plain view of the driveway. Could see the platform to the rear end and the inside wall of the warehouse building. There was no fire or smoke. I saw smoke coming from the east building. I didn't see any smoke coming from the building next to the track. The fire and smoke centered on the platform. I saw the fire when it came to the bridge. I was right across the street when this fire came to the bridge and it just crawled over on the bridge towards the other buildings. I was there about a half hour."

Edward Ebertowsky testified: "I was with my father. I am sixteen years old. I went to the fire while father reported to the fire department. When I got there there were five or six people and after about fifteen minutes it was packed. I saw smoke coming out of the work shop, shooting through the cracks. I stood in the middle of Sixth Avenue and started towards the office building. It was getting too hot so backed up a ways."

John Batch, who lived in the house next to the house that corners on Sixth Avenue for fifteen years, stated: " I went out the back door where I' could see right across in the back yard. There was a box sitting three or four feet back from the office door on the porch or platform. The flames were just coming out of that box. There was hardly anybody there at that time but they kept coming. I saw the fire crossing the bridge from the mill into the other building towards the railroad track. There was no fire there before."

Archie Malloy, who has lived within a block of the Turner property for twenty years, noticed black smoke and flames breaking out through the roof of the mill. He went at once to the fire and the bridge and none of the other buildings were on fire at that time. The only fire was the one he saw breaking out through the roof. He went home and changed his clothes and came back and volunteered as a fireman. He was on the hose that went up between the two buildings. He testified: "We were ordered to see if we could save the west building but after we got up there the fire began to grow larger and they took us out of there, and they put us around in front of the mill building and when we threw water through the window a series of explosions occurred and they took us around to the east side of the mill building to

prevent the fire from spreading over to the lumber shed. The instructions received from the chief as to the southwest building (the warehouse) was to stop the fire from going over this bridge and save the west building if it could possibly be done. The fire had just started to go across the bridge at that time."

Douglas Anderson, fourteen years of age, and Roy Collins, with other boys were playing in the driveway on Sunday, the day of the fire. He testified that there were several other boys; but he only names Roy Collins. He said: We were in the driveway and about five feet from the platform (the platform on the west side of the mill). He was there about two hours. They were playing marbles and smoking cigarettes. He thinks he smoked about three cigarettes during the time he was there. He left in about two hours but the other boys remained. On cross examination he states: They played marbles, chased some rabbits and when they smoked the cigarettes they stood up most of the time but sat down on the platform some of the time. He had been smoking cigarettes for a year or two before the fire. He was asked if he threw the cigarettes which he had finished smoking into the driveway. He answered: "I threw them— I don't know where I threw them."

Mrs. Lowe, who lives at 315 North Sixth Avenue, testified that when she was going to the fire she met three boys coming away from the fire and one of them was Roy Collins, the boy who had been playing marbles and smoking cigarettes with Douglas Anderson and who remained at the mill with the other boys when Douglas left.

The action is brought under § 4654, Comp. Laws 1913, viz.: "All railroad companies or corporations operating or running cars or steam engines over roads in this state shall be liable to any party aggrieved for all damages resulting from fire escaping or being scattered or thrown from said cars or engines; provided, that such railroad company or corporation shall not be liable for said damages when the same results from the default or negligence of the party injured."

This section, as it now reads, was passed in 1911. It amended § 4303 of the Revised Code of 1905 by striking out the word "negligently." That is the only change in the statute. Before the amendment the company was liable for fires "negligently escaping or being

negligently scattered." As amended if the fire is started by fire escaping from the engine the company is liable.

Respondent also relies upon the case of McGilvra v. Minneapolis, St. P. & S. Ste. M. R. Co. 35 N. D. 275, 159 N. W. 854. In this case a witness testified that he was a passenger upon the train and he saw a fire start up at some distance from the railroad tracks as the train passed. He said he did not know whether the fire started on the right of way or not. He said he saw nobody around the place; that the fire was on the east side of the track and he thought the wind was from the west. In addition to this testimony was the testimony of plaintiff. He had followed the trail of the fire to a point near defendant's right of way but he could not tell just where it started. The court said: "Meager though this evidence is, we think it was sufficient. . . . The fire started near the railroad track and on the open prairie. No human beings seem to have been in the neighborhood except the occupants of the train. There is no proof that there was any fire communicating agency in the neighborhood but the engine. The grass was dry and the wind was blowing towards it from the track. The fire seems to have started up almost immediately after the engine had passed the spot. There is no evidence that it was seen before the engine had passed." That fire was started in the open country where there was no other agency that could have started it and since there was no fire there before the passing of the train and no other agency to which the fire could be attributed reasonable minds must conclude that the fire was started by sparks from the locomotive.

Section 4654, Comp. Laws 1913, which makes the railroad company absolutely liable for fires started by sparks from an engine, does not change the degree of proof necessary to make a prima facie case against the railroad company for damages. It leaves the burden on the plaintiff to prove by a fair preponderance of the evidence, direct or circumstantial, that the fire was set by sparks from an engine belonging to the defendant.

51 C. J. § 1370, page 1203, states the rule as follows: "The burden of proof is on the plaintiff in all cases to show that the fire alleged to have caused the injury was communicated to his property by sparks or fire from its locomotives or trains, or by the spread of fire to

plaintiff's premises from fire set out on the right of way or other premises of the company, or on lands of others adjacent to its right of way." Citing in notes United States, Alabama, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, Alberta, British Columbia, Ontario, and Quebec. The text continuing states: "This fact can never be presumed." Seaboard Air Line R. Co. v. Charpia, 90 Fla. 576, 107 So. 173; Hines v. Venable, 81 Fla. 754, 88 So. 703. And under the statutes making the railroad company absolutely liable the text says, "and the rule is not affected by the statutes which make companies liable for injuries by fires set out by them in the absence of negligence."

In the case of Beach v. Michigan C. R. Co. 190 Mich. 592, 157 N. W. 285, the court said: "The statute does not relieve the plaintiff of the burden of establishing the origin of the fire. See Osborne v. Chicago & W. M. R. Co. 111 Mich. 15, 69 N. W. 86. In the case of Clark v. Grand Trunk W. R. Co. 149 Mich. 400, 112 N. W. 1121, 12 Ann. Cas. 559, . . . the court said: 'The fact that the fire was set as alleged must be proved, not necessarily by the testimony of an eyewitness, but by evidence which reasonably leads an inquiring and unbiased mind to the conclusion that a cinder from the particular engine caused the fire. The evidence is not sufficient if it establishes no more than that the fire might so have been set.' (This case) quoted with approval from Finkelston v. Chicago, M. & St. P. R. Co. 94 Wis. 270, 68 N. W. 1005, as follows: 'The origin of a fire under such circumstances must be established so as to produce conviction to a reasonable certainty on an unprejudiced mind, the same as any other fact; and until there is evidence to so establish it the defendant is not called upon to prove that the fire was not caused as alleged.'"

In the case of Riggins v. Missouri P. R. Co. 208 Mo. App. 26, 233 S. W. 67, the defendant's train had passed the plaintiff's house just before plaintiff's house was discovered to be on fire. The fire was discovered at the corner of the front part of the house next to the railroad track and away from any flue; the wind was strong and was blowing from the railroad track toward the house. It was not shown

that the train was emitting sparks as it passed the house, or near the house, or that any engine at any time had emitted sparks passing down this grade in the neighborhood of this house. It was shown that sometimes the fire box was shaken down when coasting down this grade and that when this was done live coals and cinders fell a distance of a few inches to the space between the ties. But there is no showing that such occurred on the occasion when plaintiff's house was burned. The court said: "Plaintiffs were not required to establish by direct evidence that their house was set on fire from sparks or cinders from defendant's locomotive engine, but they were required to establish facts from which a reasonable inference is deducible that the house was so set on fire. Unless such facts were established the demurrer should have been sustained. Gibbs v. St. Louis & S. F. R. Co. 104 Mo. App. 276, 78 S. W. 835. The probative force of the evidence must be strong enough to induce in the minds of reasonable men, the jury, that the fire in fact originated from one of defendant's locomotive engines. It is not sufficient that it might have so originated. Big River Lead Co. v. St. Louis, I. M. & S. R. Co. 123 Mo. App. 394, 101 S. W. 636; Taylor v. Lusk, 194 Mo. App. 133, loc. cit. 139, 187 S. W. 87; Grand Trunk R. Co. v. Richardson, 91 U. S. 454, 23 L. ed. 356." The fourth paragraph of the syllabus states "Where the evidence in an action for destruction of a house by ·fire set by sparks from a locomotive is wholly circumstantial, the plaintiff must show that there is no other reasonable conclusion as to the cause of the fire than that it was so caused." See Fritz v. St. Louis, I. M. & S. R. Co. 243 Mo. 62, 148 S. W. 74; Little v. St. Louis-San Francisco R. Co. (Mo. App.) 297 S. W. 980; Young v. Hines (Mo. App.) 229 S. W. 417; Frame v. Kansas City, C. & S. R. Co. (Mo. App.) 209 S. W. 314; Jones v. Chicago, M. & St. P. R. Co. (Mo. App.) 204 S. W. 192; Slack v. St. Louis, I. M. & S. R. Co. (Mo. App.) 187 S. W. 275; Bankers' & Shippers' Ins. Co. v. Charleston & W. C. R. Co. 138 S. C. 339, 136 S. E. 557; Virginian R. Co. v. London, 148 Va. 699, 139 S. E. 328; Norfolk & W. R. Co. v. Spates, 122 Va. 69, 94 S. E. 195; Waddell v. Chicago & A. R. Co. 146 Mo. App. 604, 124 S. W. 588.

In the case of Beck v. Chicago, B. & Q. R. Co. 214 Iowa, 628, 243 N. W. 154, the court said: "Appellant's counsel seems to entertain

the thought that whenever a fire occurs along a railroad right of way, the fire itself is prima facie evidence of negligence on the part of the railway company. In this, the appellant is in error. It is only when it is found, upon competent evidence, direct or circumstantial, that the railroad company set out the fire, that a case of prima facie evidence of negligence has been made out. This is a well-established and well-understood rule and needs no citation in support of it, but see German Ins. Co. v. Chicago & N. W. R. Co. 128 Iowa, 386, 104 N. W. 361; Stewart v. Iowa C. R. Co. 136 Iowa, 182, 113 N. W. 764."

In the case of Lares v. Chicago, B. & Q. R. Co. 144 Minn. 170, 174 N. W. 834, first paragraph of the syllabus says: "Where the evidence as to the origin of a fire alleged to have been negligently started points with substantially the same force to two or more independent sources, a jury should not be permitted to speculate as to which was in fact responsible."

In the case of Minneapolis Sash & Door Co. v. Great Northern R. Co. 83 Minn. 370, 86 N. W. 451, the court said: "The obscurity in which the origin of the fire is involved is increased by other evidence which tends to show that several boys were seen running away from the fire about the time it started up; and, if conjectures are authorized, and furnish grounds for inference, we might as well indulge the guess that their presence had something to do with the fire as an engine of defendant company, which the evidence fails to show passed the place of the fire at a time when it would have occasioned the same. . . . The plaintiff attempted to make a prima facie case under the statute against defendant by evidence tending to show that sparks scattered by one of its engines caused the fire. The most that it has done is to show that it was as possible that such an engine might have done so as that the fire might have been occasioned from other causes. Mere possibilities can never establish the probability of a fact requisite to be proved in order to make a railroad company or any party liable in any action whatever. To decide otherwise would be to say that verdicts may rest on mere possibility, speculation, and conjecture. Finkelston v. Chicago, M. & St. P. R. Co. 94 Wis. 270, 68 N. W. 1005; Gainesville, J. & S. R. Co. v. Edmondson, 101 Ga. 747, 29 S. E. 213; Frier v. Delaware & H. Canal Co. 86 Hun, 464,

33 N. Y. S. 886; Orth v. St. Paul, M. & M. R. Co. 47 Minn. 384, 50 N. W. 363."

In the case of General Ins. Co. v. Northern P. R. Co. 280 U. S. 72, 74 L. ed. 172, 50 S. Ct. 44, Chief Justice Taft, speaking for the court said: "A leading case in Washington is that of Thorgrimson v. Northern P. R. Co. 64 Wash. 500, 117 P. 406. . . . 'But we know of no cases going to the extent to which counsel would have us go to sustain their contention; that is, to presume negligence from the mere passing of the train followed by a fire. It is the proof of setting the fire, and not the fact that a building adjacent to a railroad right of way was burned, that raises the inference of negligence and shifts the burden of proof. In all the cases we have examined, including those from our own court, where the burden has been shifted from plaintiff to defendant, there has been some evidence from which the jury might infer with reasonable certainty that the fire would not have occurred unless set by the passing train. Counsel admitted on the trial and appellants now admit that they have no evidence other than circumstantial evidence.' The facts of the case before us do not show anything more than the passing of the train and the existence of fire fifteen or twenty minutes afterwards. No connection is shown between the fire and the passing of the train except that of sequence. The principles of the Washington case cited would require a nonsuit in this case. Nor are the Federal cases any more favorable to the petitioner." McCullen v. Chicago & N. W. R. Co. (C. C. A. 8th) 101 F. 66, 49 L.R.A. 642.

Kentwood Lumber Co. v. Illinois C. R. Co. (C. C. A. 5th) 65 F. (2d) 663 in this case the district court thought that this evidence showed no more than that a fire was discovered in a shed a few minutes after the train had passed and that it no more made out a case for a jury verdict than it did in the case of General Ins. Co. v. Northern P. R. Co. 280 U. S. 72, 74 L. ed. 172, 50 S. Ct. 44. The court said: "It might well be that if, in addition to the other matters in proof, plaintiff had shown that the fire, beginning in the dry weeds and grass on the right of way, had communicated itself to the shed, a case for the jury would have been made out. Lacking such proof, the presence of weeds and grass on the right of way is without significance. Not only is there no proof that the fire originated there,

but pictures taken after the fire, showing the right of way unburned, make it clear that it did not. Appellant is thus remitted to the position that proof alone that the fire was discovered shortly after the train had passed, and that it could have started the fire, is sufficient to take its case to the jury. In this situation it finds itself confronted not only with General Ins. Co. v. Northern P. R. Co. supra; Thorgrimson v. Northern P. R. Co. 64 Wash. 500, 117 P. 406; Hynds v. Schaff (C. C. A. 10th) 46 F. (2d) 275; Northern P. R. Co. v. Mentzer (C. C. A. 9th) 214 F. 10; Dudley v. St. Louis, I. M. & S. R. Co. 133 La. 80, 62 So. 413; but with that long line of cases in the federal courts asserting the general principle that inferences must be based on probabilities, not on possibilities; must be reasonably drawn from and supported by the facts on which they purport to rest, and may not be the result of mere surmise and conjecture, . . . Patton v. Texas & P. R. Co. 179 U. S. 658, 45 L. ed. 361, 21 S. Ct. 275; Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S. 472, 70 L. ed. 1041, 46 S. Ct. 564; New York C. R. Co. v. Ambrose, 280 U. S. 486, 74 L. ed. 562, 50 S. Ct. 198; Gunning v. Cooley, 281 U. S. 90, 74 L. ed. 720, 50 S. Ct. 231; United States v. Crume (C. C. A. 5th) 54 F. (2d) 556; Love v. New York L. Ins. Co. (C. C. A. 5th) 64 F. (2d) 829." Baxter v. Great Northern R. Co. 73 Minn. 189, 75 N. W. 1114; Brennan Lumber Co. v. Great Northern R. Co. 77 Minn. 360, 79 N. W. 1032; Swenson v. Erlandson, 86 Minn. 263, 90 N. W. 534; J. S. Moore & Co. v. Atlantic Coast Line R. Co. 173 N. C. 311, 92 S. E. 1; Seaboard Air Line R. Co. v. Minor, 82 Fla. 492, 90 So. 611.

In Finkelston v. Chicago, M. & St. P. R Co. 94 Wis. 270, 68 N. W. 1005 the building burned was in an exceedingly dry condition, owing to a long-continued period of excessively hot, dry weather. The wind was blowing from the direction of the side track towards the building. At 7:30 p.m. on the 22d day of July 1893 one of defendant's freight trains was run in on the side track until the locomotive stood alongside the warehouse. There is evidence tending to show that it was so operated by defendant's servants that coals of fire and ashes were allowed to escape from the firebox to the ground, and sparks in considerable quantities to escape from the smokestack. About 8:15 p.m. the locomotive was backed away from the building,

at which time, there is evidence tending to show, the engine was operated in such a way that the wheels slipped on the track, and that sparks were emitted from the smokestack in large and unusual quantities, and of an unusual size, some appeared, to one looking at them through the darkness, to be as large as a man's thumb, and thrown to a height of thirty to forty feet; they were carried by a light wind toward the warehouse, some of them settling on the roof and others passing over it. The fire was discovered about 9:49, about an hour and a half after the train had pulled out. The trial court granted a directed verdict. The court said: "The element of time, without proof of facilities for lodgment of sparks in some substance liable to keep them alive, is sufficient of itself to break the chain of circumstances essential to reach from the alleged cause to the alleged fact. In Sheldon v. Hudson River R. Co. 29 Barb. 226, the time between the alleged escape of fire from the locomotive and the discovery of the fire complained of was 1 hour and 17 minutes. It was alleged that the fire started by a spark passing through the open window of the mill, situated 67 feet from the railway track, that it lodged in some combustible material on the mill floor. The track master was in the vicinity 25 minutes after the train passed, where he would have observed a fire in the building if any had existed. The court held that, under the circumstances, even 25 minutes was an unreasonable length of time, because, if a live spark lodged in combustible material on the mill floor so as to start a fire, it would manifest itself before the expiration of 25 minutes. With this view, among others, the court sustained a nonsuit. Here, without any proof of the existence of material in which the fire may have smoldered for a time before breaking out, the suggestion is that a spark passed in at a window in the cupola, 30 feet above the ground, took a devious course downward, lodged somewhere in the lower part of the building, and there remained for an hour and a half before manifesting itself. After a thorough search for and examination of precedents, we may safely venture the assertion that no satisfactory authority can be found for carrying the inference of the existence of facts unseen from those seen so far as would be required to send this case to a jury. In the words of Mr. Justice Orton, in Gibbons v. Wisconsin Valley R. Co. 58 Wis. 335, 17 N. W. 134, 'mere possibility can never establish a

probability of a fact requisite to be proved, in order to make a railroad company or any party liable in any action whatever, and the proposition is no sounder in logic than in law.'"

In the New York case it was held that twenty-five minutes was an unreasonable length of time because if a live spark lodged in combustible material on the mill floor so as to start a fire it would manifest itself before the expiration of twenty-five minutes. In the Wisconsin case the fire was discovered an hour and a half after the train passed plaintiff's property and the court held that the element of time, without proof of facilities for lodgment of sparks in some substance to keep them alive is sufficient of itself to break the chain of circumstances essential to reach from the alleged cause to the alleged fact.

In the instant case the evidence shows that there had been no rain or snow for a long period of time. Everything was exceedingly dry. No evidence that there was any material that would keep a spark from a locomotive alive and smoldering for any length of time. Defendant's engine No. 718 passed plaintiff's property at least three hours before the fire was discovered and sparks from that engine could not have started the fire.

The elimination of engine No. 718 leaves the plaintiffs' right to recover depending on whether sparks from engine No. 715 started the fire which consumed plaintiff's property, and also leaves plaintiffs in much the same position that the plaintiff was in in the case of Kentwood Lumber Co. v. Illinois C. R. Co. (C. C. A. 5th). 65 F. (2d) 663, supra, where the court said: "It might well be that if, in addition to the other matters in proof, plaintiff had shown that the fire, beginning in the dry weeds and grass on the right of way, had communicated itself to the shed, a case for the jury would have been made out. . . . Not only is there no proof that the fire originated there, but pictures taken after the fire, showing the right of way unburned, make it clear that it did not. Appellant is thus remitted to the position that proof alone that the fire was discovered shortly after the train had passed, and that it could have started the fire, is sufficient to take its case to the jury. In this situation it finds itself confronted not only with General Ins. Co. v. Northern P. R. Co. 280 U. S. 72, 74 L. ed. 172, 50 S. Ct. 44, supra . . . ; but with that long line of cases in the federal courts asserting the general principle

that inferences must be based on probabilities, not on possibilities; must be reasonably drawn from and supported by the facts on which they purport to rest, and may not be the result of mere surmise and conjecture."

In the instant case the train was seen to pass the plaintiff's property at about eight miles an hour. There was some black smoke and shortly thereafter the fire was discovered. Like in the Kentwood Case there were grass and weeds on the right of way but the fire did not start there and it is not claimed that it did. But there is something a great deal more serious in the instant case. There is the direct evidence of three witnesses which shows that the fire must have started inside the mill. Oscar Johnson, Mrs. Oscar Johnson, and Luella O'Niel were at 608 North Seventh Street.

Mrs. Johnson looked out the window, saw that the windows in the mill were red; that they went out on the porch and from there they could see the flames through the windows of the sash and door factory and while they were on the porch the flames burst out of the top of the roof. Johnson went to try to call the fire department and the two women noticed the boy gone, and went over to the mill to search for him. In going to the mill they went between the railroad tracks and the warehouse and came up in front of the warehouse and mill. By that time the flames had burst out on the side of the mill back of the office. The women left at once in search of the boy, whom they found at the park.

Barney Ebertowsky, who called the fire department, was one of the first at the fire. When he arrived he said there were only four or five "kids" there. This may have been after the women were there, as they left immediately when they didn't find the boy at the mill and they were not asked and did not tell who were there at the time.

Ebertowsky testified that there was no fire in the warehouse, that he saw smoke coming from the east building, did not see any from the building next to the track. The fire and smoke centered on the platform. He saw the fire when it came to the bridge.

Archie Malloy saw black smoke and flames breaking out through the roof of the mill. When he got to the fire he said most of the fire was breaking out right through the roof. The bridge had not caught

fire at that time. The only fire he saw was in the mill. He went home, changed his clothes and came back and volunteered as a fireman. When they saw they could not save the mill the chief of the fire department told them to stop the fire from going over the bridge and to save the west building if it could possibly be done.

The buildings were all electrically wired. Besides the possibility of the fire starting on the inside from defective wiring or from other causes the evidence shows that on that day boys were playing in the driveway and on the platform and that they were smoking cigarettes and that when everybody was going to the fire one witness saw three boys going away from the fire and one of the boys who was leaving after the fire was discovered was on this platform with Douglas Anderson smoking cigarettes and remained with the other boys after Douglas left.

Witness Batch saw flames coming up out of the box on the platform. This platform had a roof over it and while the sparks from an engine might possibly swirl in under the roof it is just as probable that some of the boys threw a stub of a cigarette into the box.

It is well settled that where the evidence as to the origin of the fire points with substantially the same force to two or more independent sources, a jury should not be permitted to speculate as to which was in fact responsible.

Appellants contend that the bailiffs in charge of the jury during the trial made statements to the jury during their retirement and while considering the case, in substance, that they, the jurors, must agree upon a verdict and that the court would not accept a disagreement or permit the discharge of the jury until an agreement was reached; that thereby irregularity and misconduct occurred in the proceedings of the court and the jury in connection with said trial. To show misconduct affidavits made by jurors were offered and on the question of their competency the trial court correctly said: "The bailiffs' alleged statements to the jury, while they were deliberating, to the effect that the court would not accept a disagreement and the jury must bring in a verdict for one of the parties, are extrinsic matters which did not essentially inhere in the verdict itself, and consequently can be shown by affidavits of the jurors."

In the case of Wright v. Illinois & M. Teleg. Co. 20 Iowa, 195,

Judge Cole, in a very learned opinion, reviewed the authorities at great length and says: "While we do not feel entirely confident of its correctness, nor state it without considerable hesitation, yet we are not without that assurance, which, under the circumstances, justifies us in laying down the following as the true rule: That affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occuring during the trial or in the jury room, which does not essentially inhere in the verdict itself."

In the case of Perry v. Bailey, 12 Kan. 539, Judge Brewer, then a judge of the Supreme Court of Kansas, quotes at length from Judge Cole's opinion in Wright v. Illinois & M. Teleg. Co. 20 Iowa, 195, supra, and then says, "This quotation from the opinion of Mr. Justice Cole seems to us to state very clearly and correctly the law applicable to questions of this kind. . . . Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony. . . . But as to overt acts, they are accessible to the knowledge of all the jurors."

The rule, as announced, by Judge Cole. and followed now by nearly all the courts, is that anything that is properly before the jury, which includes everything that was submitted, cannot be impeached because it all inheres in the verdict itself; but the jurors can testify or make affidavits stating the facts as to any outside interference of any kind or of coercion by the court or bailiffs. See annotation in 90 A.L.R. 249; Emmert v. State, 127 Ohio St. 235, 187 N. E. 862, 90 A.L.R. 242.

The trial court continues as follows: "But to justify the court in granting a new trial on the basis of the alleged statements of the bailiffs to the jurors, or some of them, it must appear that the defendants were damaged by those statements. . . . The right to a new trial on this ground is based, as in other cases, on injury materially affecting a substantial right of the party seeking the remedy. . . ."

The trial court's attention was not called to the case of State v. Zimmerman, 60 N. D. 256, 233 N. W. 845, 79 A.L.R. 816. In this case the court quotes from State v. Church, 7 S. D. 289, 64 N. W. 152, as follows: "'We believe the true and only safe rule to be that where the separation is such that one or more of the jurors might have

been improperly influenced by others, and there is nothing reliable to show that such influence has not been exercised to the prejudice of the accused, the verdict should be vacated and the case be retried.' " In the syllabus this court said: "Where in a criminal case after the cause is submitted to the jury one of the jurymen is permitted to leave his fellow jurymen and go to the postoffice to procure his mail, such separation constitutes an irregularity contrary to the provisions of § 10,864, Comp. Laws 1913. But where it affirmatively appears that no improper influences were used or attempted and that no prejudice could have resulted therefrom, such irregularity does not entitle the defendant to a new trial." And in the case of State v. Lamoreaux, 62 N. D. 55, 241 N. W. 595, the court said: "There is some confusion in the decisions arising from different statutes and there is a clear distinction between separation of the jurors before the case is finally submitted to them and after the case has been submitted. It has always been and is now clearly the intent of the law, requiring jurors to be kept together, to safeguard the rights of the defendant and of the state, by preventing an opportunity for communication with the jurors after the case has been finally submitted."

There are cases like People v. Weston, 32 Cal. App. 571, 163 P. 691, where one of the jurors became temporarily ill. The officer telephoned for a doctor and permitted the doctor to enter the jury room and prescribe for and treat the juror. The officer was present all of the time and sat in the hearing of the doctor and nothing was done or said except to relieve the condition of the sick juror, who was quickly relieved of pain. And like the Zimmerman Case, 60 N. D. 256, 233 N. W. 845, 79 A.L.R. 816, supra, and the case of People v. Carson, 49 Cal. App. 12, 192 P. 318, and in all such cases where it affirmatively appears that there was no prejudice, a new trial should not be granted.

1 Hayne on New Trial, § 26, page 142 states, "The leading case on the subject is Com. v. Roby, 12 Pick. 496. In that case the irregularity complained of was alleged to have been committed by the jury." After reviewing the authorities at length Chief Justice Shaw said: "The result of the authorities is that where there is an irregularity which may affect the impartiality of the proceedings, as where meat

and drink or other refreshment has been furnished by a party, or where the jury have been exposed to the effect of such influence, as where they have improperly separated themselves, or have had communications not authorized there, inasmuch as there can be no certainty that the verdict has not been improperly influenced, the proper and appropriate mode of correction or relief is by undoing what is thus improperly, and may have been corruptly, done."

In Hare v. State, 4 How. (Miss.) 187, Chief Justice Sharkey, quoting at length from Chief Justice Shaw's opinion in Com. v. Roby, 12 Pick 496, supra, includes the foregoing quotation and then states very tersely, "To me it seems that the line of distinction is here so clearly drawn, that it is impossible to mistake it, and so fortified by reason as to place it beyond doubt. It is briefly this:—If the purity of the verdict *might* have been affected, it must be set aside; if it could not have been affected, it will be sustained. A verdict on which doubts might rest cannot be good. The same learned judge says, 'it must command entire confidence.'

"The reason here given runs through all the decided cases. . . . Com. v. McCaul, 1 Va. Cas. 271; M'Lain v. State, 10 Yerg. 241, 31 Am. Dec. 573. . . . In the case of Knight v. Freeport, 13 Mass. 218 . . . the court said 'too much care and precaution cannot be used to preserve the purity of jury trials.' This strictness is necessary to give due confidence to the parties in the results of their causes; and every one ought to know that for any, even the slightest intermeddling with jurors, a verdict will always be set aside." Citing Perkins v. Knight, 2 N. H. 474. "The thing to be guarded against is improper influence; can it not be as well exercised in the jury room by an individual who has the art and capacity to exercise it, as it can any where else? Woodley was with the jury, how long is not known; who can say that he did not speak of the guilt of the prisoner? Who can say that he had not influence, and that his influence was not exerted to procure a verdict of guilty. If it was legal for Woodley to be with the jury, it would also be legal for any one else to be there. . . .

"To me it seems that all the evils are fully incurred by letting an unauthorized person into the jury room, that could be incurred by

letting them separate. It seems to be a proposition too clear to admit of a doubt, that in this way the verdict *might* be tainted with corruption or bias."

In the case of People v. Brannigan, 21 Cal. 337, Chief Justice Field, afterwards a Judge of the Supreme Court of the United States, speaking for the court said: "The language of the oath administered to the officer having the jury in charge points out with clearness his duties. He is required 'to keep them together;' that is, he must not permit them to separate. He must keep them 'in some *private* and convenient place;' that is, removed from access by strangers. He must not 'permit any person to speak to them,' a duty which can only be performed by following the previous requirement of keeping them in a private place. And, finally, he must not speak to them himself, except to ask them whether they have agreed upon a verdict. When either of these requirements is disregarded by the officer, he fails to perform his duty, and the trial is irregularly conducted. . . . If such protection be not afforded, suspicions are excited and confidence in the justice of their decision is destroyed. It would seem therefore but reasonable, where an irregularity has been committed, which *may* have affected the jury, that the Government, seeking to uphold their action, should be called upon to show that no injury to the prisoner has followed from the irregularity complained of. If this can be shown, their verdict will not be disturbed—for the end which the law contemplated by its provisions has been attained. . . . The District Attorney appears to have considered it incumbent upon the prisoner to show affirmatively injury to himself resulting from the separation, or at least to suspect such injury. There are authorities which support this view. Such are the cases cited from the New York Courts. But there are authorities of equal weight the other way, and the latter, we think, are supported by better reasons." Com. v. M'Caul, 1 Va. Cas. 271; McLain v. State, 10 Yerg. 241, 31 Am. Dec. 573; Riley v. State, 9 Humph. 646; McCann v. State, 9 Smedes & M. 465; State v. Prescott, 7 N. H. 287.

A case very much like the Mississippi case is the case of People v. Knapp, 42 Mich. 267, 3 N. W. 927. In this case when the jury retired to consider their verdict, an officer accompanied them and re-

mained in the room during the deliberations. The attention of the court was called to the fact on a motion for a new trial, but on its being made to appear that the officer did not converse with the jury in their room, the court denied the motion upon the theory that since he did not speak to them his presence there was not prejudicial. Judge Cooley, speaking for the court, said: "Whether he does or does not converse with them, his presence to some extent must operate as a restraint upon their proper freedom of action and expression. When the jury retire from the presence of the court, it is in order that they may have opportunity for private and confidential discussion. . . . The presence of a single other person in the room is an intrusion upon this privacy and confidence, and tends to defeat the purpose for which they are sent out. . . . The only proper and just course is to insist upon a rigorous observance of the proper practice, in order to prevent all occasion for injurious suspicions."

The theory upon which this case was decided is the same as in the opinion of Chief Justice Shaw in Com. v. Roby, 12 Pick. 496, supra, and the doctrine is thoroughly established in California in People v. Backus, 5 Cal. 275; People v. Brannigan, 21 Cal. 337.

In 1 Hayne on New Trial, § 26, page 146, it is stated that "The rule is laid down by the foregoing cases, viz., that where an irregularity is shown which may have influenced the result, it is for the successful party to show that as a matter of fact it did not, rests upon sound principles. Corrupt and other improper actions are usually done in secret, and are carefully covered up; and it would always be difficult, and in many cases impossible, for the moving party to show that the irregularity was in fact followed by some corrupt or otherwise improper influence, while it is comparatively easy for the juror to explain an apparently doubtful act if it be innocent. To require the moving party to show that the irregularity was followed by improper influence would lead to the keeping up of a system of espionage upon the jurors which cannot be consistent with sound policy. And where an act of doubtful propriety is shown to have followed the irregularity, it would be necessary to conduct an investigation into its effect on the juror's mind, which is manifestly impracticable. The rule above stated is sustained by high authority. The views of such

jurists as Shaw, Sharkey, Field, and Clifford are not lightly to be put aside." In this galaxy of distinguished jurists the author might well have included Judge Cooley of Michigan.

The case of Lynch v. Kleindolph, 204 Iowa, 762, 216 N. W. 2, 55 A.L.R. 745, is a very well considered case. The defendant Kleindolph had charge of the county home located some miles from the county seat where the case was being tried. As the defendant was about to return to the home at the noon hour, one of the jurors remarked that he had never been out to the poor farm and that he would like to ride out and look the place over. The defendant replied "All right." They got into the automobile and on their arrival at the poor farm, dinner being already prepared, the juror, on the invitation of the defendant, had dinner with the family. They were gone not to exceed an hour and a half. The defendant made an affidavit that the case on trial was never mentioned at any time. The court said: "The question involved herein is of a more serious character than would appear at first blush. There is probably no more interesting or fascinating question involved in the history of the courts than the origin and development of the jury system. It is one of the most vital elements of our system of government. So far as the average citizen is concerned, he is less in touch with the executive and legislative department. When he is confronted with private or public differences, he naturally turns to the court for relief. His faith in the courts must be encouraged. When the time comes that our people lose faith in the courts, our form of government is fast nearing its end. It is meet and proper, therefore, that on questions of this kind the ruling should be such as to support the faith of litigants in our judicial system. That faith can only be sustained by keeping our judicial proceedings not only free from wrong, but free from all suspicion of wrong. In other words, all our court proceedings should be like Caesar's wife, 'above suspicion.' . . ." Many similar cases are discussed and cited in the opinion and in the voluminous notes in 55 A.L.R. beginning on page 750. Cases involving misconduct of officers in charge of the jury are: Mattox v. United States, 146 U. S. 140, 36 L. ed. 917, 13 S. Ct. 50; Clay v. Montgomery, 102 Ala. 297, 14 So. 646; Alabama Fuel & Iron Co. v. Rice, 187 Ala. 458, 65 So. 402; Taylor v. State, 18 Ala. App. 466, 93 So. 78; Heller v. People, 22 Colo. 11,

43 P. 124; Cole v. Swan, 4 G. Greene, 32; State v. LaGrange, 99 Iowa, 10, 68 N. W. 557; Nelms v. State, 13 Smedes & M. 500, 53 Am. Dec. 94; Barnett v. Eaton, 62 Miss. 768; Shaw v. State, 79 Miss. 577, 31 So. 209; Wiggins v. Downer, 67 How. Pr. 65; Thomas v. Chapman, 45 Barb. 98; People v. Smith, 187 N. Y. S. 836; Emmert v. State, 127 Ohio St. 235, 187 N. E. 862, 90 A.L.R. 242; State v. Place, 20 S. D. 489, 107 N. W. 829, 11 Ann. Cas. 1129; Driver v. Pate, 16 Ala. App. 418, 78 So. 412.

There is a very strong circumstance in this case which indicates that the jury were influenced by statements made by the bailiffs, namely, the fact that they paid no attention whatever to the instructions of the court on the question of damages. There was no dispute in the evidence as to the value of the property. It was all received without objection by a witness who the defendants' attorney admitted was qualified to testify as to the value of the property and they returned a verdict for considerably less than one-third the value of the property, as shown by the evidence.

Wherever it appears that a verdict is a compromise verdict, that is, where it is apparent that some of the jurors have conceded their conscientious belief that the defendant ought to prevail to the end that an agreement might be reached, the whole verdict is tainted and will be set aside.

The leading case on the subject is Simmons v. Fish, 210 Mass. 563, 97 N. E. 102, Ann. Cas. 1912D, 588. This was a case to recover for the loss of an eye. The jury returned a verdict for two hundred dollars. On a motion for a new trial it was claimed that the verdict amounted to a verdict for the defendant. It was also urged that this was a compromise verdict where said jurors must have conceded their conscientious belief that the defendant ought to prevail to the end that an agreement might be reached. Chief Justice Rugg, speaking for the court, said: "In order to pass upon the soundness of this argument, it becomes necessary to inquire what a compromise verdict is, and to ascertain whether this was such a verdict. It was said by Cooley, J., in Goodsell v. Seeley, 46 Mich. 623, at page 628, 10 N. W. 44, at page 46, 41 Am. Rep. 183: 'It is no doubt true that juries often compromise . . . and that by splitting differences they some-

times return verdicts with which the judgment of no one of them is satisfied. But this is an abuse. The law contemplates that they shall, by their discussions, harmonize their views, if possible, but not that they shall compromise, divide and yield for the mere purpose of an agreement. The sentiment or notion which permits this tends to bring jury trial into discredit, and to convert it into a lottery.' See also Meyer v. Shamp, 51 Neb. 424, 430, 71 N. W. 57. While jurymen must not go contrary to their convictions, they ought properly to give great heed to the opinions of their fellows, and by reasonable concessions reach a conclusion which, although not that originally entertained by any of them, nevertheless may be one to which all can scrupulously adhere. Dorr v. Fenno, 12 Pick. 521; Com. v. Tuey, 8 Cush. 1; Com. v. Whalen, 16 Gray, 25; Com. v. Poisson, 157 Mass. 510, 32 N. E. 906; McCoy v. Jordan, 184 Mass. 575, 69 N. E. 358; Highland Foundry Co. v. New York, N. H. & H. R. Co. 199 Mass. 403, 85 N. E. 437; Scholfield Gear & Pulley Co. v. Scholfield, 71 Conn. 1–23, 40 A. 1046; Hamilton v. Owego Waterworks, 22 App. Div. 573, 48 N. Y. S. 106, affirmed 163 N. Y. 562, 57 N. E. 1111; Wolf v. Goodhue F. Ins. Co. 43 Barb. 400–407, affirmed in 41 N. Y. 620; Owens v. Missouri P. R. Co. 67 Tex. 679–684, 4 S. W. 593; Benedict v. Michigan Beef & Provision Co. 115 Mich. 527, 73 N. W. 802; Snyder v. Lake Shore & M. S. R. Co. 131 Mich. 418, 91 N. W. 643. A verdict which is the result of real harmony of thought growing out of open-minded discussion between jurors with a willingness to be convinced, with a proper regard for opinions of others and with a reasonable distrust of individual views not shared by their fellows and of fair yielding of one reason to a stronger one, each having in mind the great desirability of unanimity both for the parties and for the public, is not open to criticism. But a verdict which is reached only by the surrender of conscientious convictions upon one material issue by some jurors in return for a relinquishment by others of their like settled opinion upon another issue and the result is one which does not command the approval of the whole panel, is a compromise verdict, founded upon conduct subversive of the soundness of trial by jury. The jury room cannot be entered in order to ascertain what has transpired there. Its deliberations are in secret, and ordinarily cannot be made the subject of testimony by jurors. Woodward v.

Leavitt, 107 Mass. 453, 9 Am. Rep. 49. What went on there may be learned by other sources. Wright v. Abbott, 160 Mass. 395, 36 N. E. 62, 39 Am. St. Rep. 499. It is not infrequently possible to determine with some approximation to accuracy what went on there from the result produced. This is such a case.

"It is plain that this was a compromise verdict. That conclusively appears from the record. The issue of liability was contested at the trial. There was no contest as to the injury done. It was such as necessitated the removal of the eye of a boy under 21 years of age. . . . The damage under the law, if liability was established, should have been assessed not according to the degree of culpability of the defendant, but solely upon the basis of compensation to the plaintiff. The single question was what was the money value to be awarded to a boy for the loss of an eye. The jury said $200. It is inconceivable that any jury, having agreed upon the issue of liability, should have reached such a determination as to damages. They had no right to consider the subject of damages until they had settled the liability in favor of the plaintiff. The verdict itself is almost conclusive demonstration that it was the result not of justifiable concession of views, but of improper compromise of the vital principles which should have controlled the decision. It could have been reached only by certain of the panel conceding their conscientious belief that the defendant ought to prevail upon the merits in order that a decision might be reached."

In the case of Farr v. Fisher, 107 Vt. 331, 178 A. 883, 98 A.L.R. 926, the second paragraph of the syllabus states, "Where, from the inadequacy of the damages awarded, in view of the evidence on the subject and the conflict of the evidence upon the question of liability, or from other circumstances, the plain inference may be drawn that the verdict is the result of a compromise, the error taints the entire verdict, and a new trial should be ordered upon all issues." This case cites and quotes from the case of Simmons v. Fish, 210 Mass. 563, 97 N. E. 102, Ann. Cas. 1912D, 588, supra. Also from Parizo v. Wilson, 101 Vt. 514, 144 A. 856, as follows: "It is further said in Parizo v. Wilson, supra: 'Where, from the inadequacy of the damages awarded, in view of the evidence on the subject and the conflict of the evidence upon the question of liability, or from other circum-

stances, the plain inference may be drawn that the verdict is the result of a compromise, the error taints the entire verdict, and a new trial should be ordered upon all issues.' "

In the next case, Rawle v. McIlhenny, 163 Va. 735, 177 S. E. 214, 98 A.L.R. 930, the court says: "Where . . . the evidence warrants the inference that, instead of deciding the question of liability, the jury has arbitrarily determined to make both parties bear a part of the burden of the injury, or for some other reasons the ends of justice would seem to be better promoted by granting a new trial on all issues, where the court sets aside a verdict of this class, it should grant a new trial on all issues."

Clearly the foregoing is applicable to the instant case. It seems clear that the jurors not being able to agree on the liability of the defendants determined to make both parties bear a part of the burden of the injury. Following the case of Rawle v. McIlhenny, supra, are voluminous notes giving the rule where smallness of damages awarded by jury indicates compromise verdict, namely: Schuerholz v. Roach (C. C. A. 4th) 58 F. (2d) 32 (writ of certiorari denied in 287 U. S. 623, 77 L. ed. 541, 53 S. Ct. 78); Southern P. Co. v. Gastelum, 36 Ariz. 106, 283 P. 719; Davis v. Whitmore, 43 Ariz. 454, 32 P. (2d) 340; Donnatin v. Union Hardware & Metal Co. 38 Cal. App. 8, 177 P. 845; McCarty-Johnson Heating & Engineering Co. v. Prankel, 70 Colo. 330, 201 P. 36; Murray v. Krenz, 94 Conn. 503, 109 A. 859; Simmons v. Fish, 210 Mass. 563, 97 N. E. 102, Ann. Cas. 1912D, 588, supra; Doody v. Boston & M. R. Co. 77 N. H. 161, 89 A. 487, Ann. Cas. 1914C, 846; Juliano v. Abeles, 114 N. J. L. 510, 177 A. 666; Sussman v. Yellow Taxicab Co. 7 N. J. Mis. R. 325, 145 A. 470; Doucha v. Hamilton, 8 N. J. Mis. R. 890, 152 A. 175; Sayegh v. Davis, 46 R. I. 375, 128 A. 573; Riley v. Tsagarakis, 53 R. I. 261, 165 A. 780; Parizo v. Wilson, 101 Vt. 514, 144 A. 856, supra; Farr v. Fisher, 107 Vt. 331, 178 A. 883, 98 A.L.R. 926, supra; Munden v. Johnson, 102 W. Va. 436, 135 S. E. 832. And there are a number of other cases cited in the notes where nothing was said about the probability that the verdict was a compromise verdict, the court held that the disregard of the evidence on the issue of damages indicated a like disregard of the evidence on the issue of liability.

In Schuerholz v. Roach (C. C. A. 4th) 58 F. (2d) 32 (writ of

certiorari denied in 287 U. S. 623, 77 L. ed. 541, 53 S. Ct. 78), supra, an action for personal injuries, the action of the trial court in providing for a new trial generally on the ground that the verdict was grossly inadequate, and in refusing to limit the second trial to the sole issue of the amount of damages sustained, was upheld as a valid exercise of its discretion, it being observed by the court that it was obvious that the sum awarded for the injury sustained was grossly unjust and inadequate and must have been so regarded by the jurors who rendered the verdict; that it could not represent a fair estimate of the plaintiff's loss, but indicated merely a difference of opinion among the jurors as to defendant's liability and a compromise of the controversy at the expense of both litigants; that such a verdict should be set aside not only as to damages, but as to liability, as it speaks with no greater authority on the one subject than on the other. Upon the second trial of this case the jury found a verdict for the defendant.

In Riley v. Tsagarakis, 53 R. I. 261, 165 A. 780, supra, where the uncontradicted evidence showed that the damages in an action for wrongful death were $11,000, and the jury rendered a verdict for only $5,000, the appellate court was of the opinion that the verdict was the result of a compromise on the questions of liability and damages, and that the trial court erred in limiting the new trial to the question of damages only. Likewise in Munden v. Johnson, 102 W. Va. 436, 135 S. E. 832, supra.

In the case of Stetson v. Stindt (C. C. A. 3d) 279 F. 209, 23 A.L.R. 302, the court said: " 'The jury were instructed that if they found in favor of the plaintiffs, their verdict should be for the balance claimed upon the note, amounting with interest to $56,990.70. Otherwise the verdict should be for the defendant. The jury, in apparent disregard of the instruction of the court, upon some basis of reasoning which is not apparent, rendered a verdict in favor of the plaintiffs in the amount of $27,439.42. The plaintiffs assigned this as one of the reasons for the granting of a new trial but withdrew the motion and were satisfied to accept the amount of the verdict. (The defendant also assigned it as a reason for a new trial.) . . .' . . .

"The law on the subject is not entirely settled. There are three lines of conduct which courts in this situation follow according as they

regard their duty. . . . The third is based on the broad propositions of law that a verdict which is contrary to the law of the case or which is not sustained by evidence in the case must be set aside. On this general law some courts have squarely met the question and have held that an instruction on the measure of damages is an instruction on the law, that a verdict by the jury in disregard of such instruction calls for a new trial, and that, under these circumstances, refusal by the trial court to grant a new trial constitutes reversible error. Wilson v. Whittaker, 5 Phila. 358; Hunt v. Bruner, 6 Phila. 204; Peterson v. Patrick, 126 Mass. 395; Holcombe & Bowden v. Reynolds, 200 Ala. 190, 75 S. 938; Johnson County Sav. Bank v. Richardson & Son, 9 Ga. App. 466, 71 S. E. 757; Powers v. Gouraud, 19 Misc. 268, 44 N. Y. S. 249; Martin-Brown Co. v. Pool (Tex. Civ. App.) 40 S. W. 820; Simpson v. Buck, 5 Lans. 337; Bauder v. Lasher, 5 Lans. 335; Hoffman v. Bosch, 18 Nev. 360, 4 P. 703; Laclede Power Co. v. Nash, 95 Mo. App. 412, 69 S. W. 27; Lozier Motor Co. v. Ziegler (Sup.) 115 N. Y. S. 134; Lish v. Martin, 55 Mont. 582, 179 P. 826; British Empire Ins. Co. v. Hasenmayer, 90 Or. 608, 178 P. 180; Bigelow v. Garwitz, 61 Hun, 624, 15 N. Y. S. 940; Kennedy v. McCook, 23 Ga. App. 422, 98 S. E. 390; Thomas v. Hatch (C. C.) 3 Sumn. 170, Fed. Cas. No. 13,899. . . .

"We are persuaded by the ratio decidendi of the last line of authorities that a verdict like the one under consideration, which is perverse and directly violative of the charge of the court and is wholly without evidence to support it, cannot stand. It is not sufficient to say that the defendant cannot complain because he was not injured. He was injured by being deprived of the right of a litigant to have the jury determine his liability under the law as laid down by the court. That liability might be for more than the jury found; yet it might be for nothing. What his liability is, the jury refused to say; but said something else, which, under the law and on the facts, was simply untrue. Therefore, we are of the opinion that the verdict was invalid and that the court erred in entering judgment upon it." Notes to this case are found in 23 A.L.R. beginning on page 305. Feldman v. Levy, 56 Misc. 563, 106 N. Y. S. 1092; Jacobs v. Oren, 30 Or. 593, 48 P. 431; Bigelow v. Garwitz, 61 Hun, 624, 15 N. Y. S. 940; Myers v. Myers, 86 App. Div. 73, 83 N. Y. S. 236; Oliver v.

Moore, 58 Hun, 609, 12 N. Y. S. 343; Metz v. Campbell Printing-Press & Mfg. Co. 11 Misc. 284, 32 N. Y. S. 155; Jensen v. Duvall, 192 Iowa, 960, 185 N. W. 584; Bressler v. McVey, 82 Kan. 341, 108 P. 97.

20 R. C. L. § 65, page 281, states the rule as follows: "There are two classes of cases in which an excessive verdict may be set aside; one case (class) is where the law recognizes some fixed rules and principles in measuring the damages, whence it may be known that there is an error in the verdict. In this case (class) are included actions on contracts, or for torts done to property, the value of which may be ascertained by evidence. The other case (class) includes actions for personal torts where no rules are prescribed by law for ascertaining the damages, but from the exorbitancy of them the court must conclude that the jury acted from passion, partiality, or corruption. In the first class where the damages are susceptible of ascertainment by calculation, there is no difficulty in applying the rule, and where the verdict is excessive it is the duty of the court to grant a new trial."

20 R. C. L. page 283, § 67, provides: "A verdict for a grossly inadequate amount stands upon no higher ground in legal principle, or in the rules of law, than a verdict for an excessive or extravagant amount, and a new trial may be granted upon the one ground as well as upon the other."

In the instant case there is no conflict in the evidence on the question of damages and the amount found by the jury is grossly disproportionate to the amount which plaintiff's testimony tended to establish. But the verdict for $10,000 is a substantial amount indicating a compromise verdict in which the jury determined to make both parties bear the loss, which taints the entire verdict not only for the plaintiffs but for the defendants. If it is a tainted verdict it is tainted for the defendants as well as for the plaintiffs. All are equal before the law and the defendants are deprived of a substantial right by not having their liability fairly determined.

This would follow on the record in this case even if there were no direct testimony of the misconduct of the bailiffs; but the record also shows that after the jury had been out more than twenty hours they

stood about evenly divided for the plaintiffs and defendants on the question of liability, that there was something said by the bailiffs about the necessity of arriving at a verdict, and there was talk among the jurors about the necessity of arriving at a verdict, and enough was said which might subject the verdict to suspicion.

To keep the conduct of the jurors and verdict above suspicion the law should be strictly followed. That part of § 7625, Compiled Laws 1913, which is material reads as follows: "They (the jurors) must be kept together in some convenient place under charge of an officer, until they agree upon a verdict or are discharged by the court .. . . the officer having them under his charge must not suffer any communication to be made to them, or make any himself except to ask them if they have agreed upon a verdict; and he must not before their verdict is rendered communicate to any person the state of their deliberations or the verdict agreed upon."

This is a plain, mandatory statute and the officer in charge must not suffer any communications to be made to the jurors and he must not speak to them himself except to ask them if they have agreed upon a verdict.

Most of the cases cited are criminal cases; but the reason for requiring the officer in charge to keep them together and to suffer no one to speak to them and not to speak to them himself except to ask them if they have agreed upon a verdict are the same in criminal and civil cases. Both are mandatory statutes intended to keep the conduct of the jury and verdicts above suspicion. The parties to a civil action are entitled to a fair trial the same as the defendant and the state are entitled to a fair trial in a criminal action.

The evidence in this case is not sufficient to sustain the verdict. However, a majority of the members of the Court think there should be a new trial. Accordingly the order and judgment of the court appealed from are reversed and a new trial is ordered on the merits.

CHRISTIANSON, Ch. J., and MORRIS and NUESSLE, JJ., concur.

BURR, J.: I concur solely on the ground it is not shown that the damages resulted "from fire escaping or being scattered or thrown from" the cars or the engines of the defendant.